[No. S064337. July 6, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RAMON JAY ROGERS, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Kent Barkhurst, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Maxine P. Cutler and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—A jury convicted defendant Ramon Jay Rogers of the first degree murders of Beatrice Toronczak and Rose Albano and the second degree murder of Ron Stadt. (Pen. Code, § 187, subd. (a).)[1] The jury also found true the special circumstance that defendant had been convicted of multiple murders. (§ 190.2, subd. (a)(3).) At the penalty phase of trial, the jury returned a verdict of death. Appeal to this court is automatic. (§ 1239, subd. (b).)

We affirm the judgment of death as modified to reflect that defendant's sentence on the second degree murder count is 15 years to life in prison. (See *post*, pt. II.C.1.)

---

[1] All further statutory references are to this code unless otherwise indicated.

## I. Facts

### A. *The Guilt Phase*

Defendant was the resident manager of an apartment complex at 7007 Saranac in San Diego. In 1996, he was arrested and charged with murdering Ron Stadt, Rose Albano, and Beatrice Toronczak. Stadt was once defendant's roommate and best friend. He vanished in June 1993, and his body was never found. Albano had been living with defendant and was pregnant with his child at the time of her disappearance in December 1993. On December 29, 1993, her left arm, left leg, and jawbone were found in a trash bag approximately a mile and a half from defendant's sister's home. Toronczak had a five-year-old son with defendant and had recently moved into his apartment when she disappeared in February 1996. The next month, her severed fingers and parts of her jawbone were discovered in a storage area beneath defendant's apartment.

The three victims had been acquainted with each other, and many of the witnesses at trial knew all three.

### 1. *The Prosecution Case*

#### a. *Ron Stadt*

While in the Navy, Ron Stadt and defendant became best friends. After leaving the Navy, they both lived in San Diego. In July 1992, Stadt separated from his wife Debra Stadt. He subsequently moved in with defendant, but did not stay there for long because he felt uncomfortable. In April or May 1993, Stadt discovered defendant was having an affair with Debra. Stadt intended to use evidence of the affair in his child custody dispute with Debra.

On June 24, 1993, Michael Proo was at work with Stadt when he overheard Stadt talking to defendant on the telephone in a heated conversation. After the call, Stadt told Proo he was going to defendant's apartment to retrieve some personal items, perhaps jewelry, left there by Debra. Stadt and defendant had not been getting along, and Stadt was worried that defendant's offer to return the jewelry was a setup. Stadt asked Proo and Proo's wife to go with him, but they declined. Around 6:15 or 6:30 p.m., Stadt left the shop to go to defendant's apartment. Although Stadt was scheduled to work the next day, he never returned, not even to collect his paycheck.

On June 24, 1993, about 6:20 p.m., Debra drove to defendant's apartment. She saw Stadt driving his truck in the alley to the apartments on Saranac, with defendant following in his own truck. Defendant saw Debra and told her

in a "fairly urgent" tone of voice to leave. Debra complied. Neither she nor any of Stadt's friends, family members, or other contacts ever saw Stadt again. After June 24, 1993, Stadt's credit card accounts showed no cardholder activity.

The next day, Debra asked defendant why he was with Stadt, since she understood the two were no longer talking to each other. Defendant said Stadt was at the apartments to pick up a ladder. On July 2, 1993, however, defendant told a detective from the Imperial Beach Sheriff's Department that Stadt came to his residence about 6:45 p.m. on June 24, 1993, to pick up jewelry Debra had left.

After Stadt disappeared, defendant stated to Debra and other friends at various times that Stadt was killed in a fight, that he drove off into the sunset, that he was missing and would not be bothering Debra anymore, that he left because he did not want to pay child support, and that he was mountain lion food. Debra once indicated to defendant that if he had done anything to Stadt, then Stadt's body could be identified by his extensive dental work. Defendant responded that was the only thing he had forgotten, and it was the only mistake he had made.

Debra testified that, after Stadt vanished, defendant was in possession of Stadt's key to Debra's car and a radar detector that had belonged to Stadt. Stacie Wickett and Gwytha Zelinsky testified that, after Stadt disappeared, defendant had called them using their unlisted telephone numbers. The women had not given these numbers to defendant but had shared them with Stadt, who presumably wrote them in his phonebook.

b. *Rose Albano*

Defendant told Loretta Peer that Rose Albano was pregnant, and that Albano claimed he was the father. He told Ash Darwish that he wanted Albano to get an abortion and move out of his apartment, but she wanted to do neither. Defendant told Kimberly Skolte he did not want to marry Albano, and told Skolte and Darwish he did not want to be responsible for Albano's other two children.

Albano's parents last saw Albano on December 18, 1993. On December 23, 1993, defendant called the San Diego Police Department to report Albano missing. He said he last saw her on December 12, 1993, at around 1:00 p.m. He also said she was pregnant, she lived with him at 7007 Saranac, apartment 209, and she might be carrying about $6,400 she had withdrawn from her retirement account. On December 24, 1993, defendant again called the police to report Albano missing, but this time he gave a different address for her, and said he last saw her on December 21, 1993, at 7:00 a.m.

Defendant never expressed any concern over Albano's disappearance and did not tell his friends, unless they asked, that she was gone. He was evasive when Pamela LeFrere suggested they look for her. Regarding Albano's disappearance, defendant told friends and others at various times that she had gone to Los Angeles or to see her sister, that she and Stadt were shopping in Mexico, that she went shopping one night and did not return, and that she might have gone to the Philippines. Around Christmas of 1993, before Albano vanished, defendant had told Loretta Peer that Albano would be leaving his apartment in two weeks because she had lined up a secretarial job.

On December 29, 1993, Albano's partial remains were found in a trash bag in a rural, mountainous area about a mile or a mile and a half from defendant's sister's house. On that same day, defendant informed his sister that Albano's mother told him Albano's body parts had been found. The San Diego County Sheriff's Department, however, did not tell Albano's parents that her remains had been identified until January 27, 1994.

Other evidence showed that on December 17, 1993, Albano had withdrawn over $4,600 from her retirement account. After she went missing, defendant had a used engine and new tires installed on his truck, which would have cost approximately $4,000.

Kimberly Skolte testified that around the second week of March 1994, defendant told her that Albano had been found murdered and the police had interrogated him. Defendant gave Skolte $2,400 in cash, his airline ticket to Poland for the end of March (to visit Beatrice Toronczak and their son), his ATM card with his personal identification number (PIN), his mailbox keys, and his passport. The next day, he brought her Toronczak's passport. Defendant told Skolte to hold onto his things, because he was concerned he was a suspect and afraid the police would find the plane ticket and think he might have had a motive or be fleeing. On March 18, 1994, he gave her another $600 in cash. Skolte returned the items to defendant after two weeks because she did not want to be responsible for them.

### c. *Beatrice Toronczak*

Defendant and Beatrice Toronczak had a young son named Nicholas. For a period of time, Nicholas lived with Toronczak in Poland, and defendant was determined to get him back. Defendant did not care for the way Toronczak was raising Nicholas. In late 1995, defendant traveled to Warsaw and returned with Nicholas on January 3, 1996. Toronczak arrived in San Diego on February 11, 1996, and moved into defendant's apartment. Defendant had to move his then live-in girlfriend, Rose McKinney, to another apartment in the complex because Toronczak did not want McKinney around Nicholas.

Toronczak was last seen on or shortly after her birthday on February 18, 1996. Defendant told friends and Toronczak's mother different things about her disappearance, e.g., that he did not know where Toronczak was, that Toronczak ran off with a Mexican man to the Mexican border, that she left and probably went to Germany, and that she maybe went to Las Vegas or to Poland. Defendant expressed no concern over her disappearance and did not try to find her. He refused a request by Toronczak's mother to file a missing person report and told her not to worry. Meanwhile, Nicholas was living with defendant.

On March 11, 1996, the police went to defendant's apartment to investigate a missing person report concerning Toronczak. They entered the three storage rooms underneath defendant's apartment and saw evidence of a crime scene. After securing a search warrant, the police seized a number of items from those rooms, including a tote bag containing Toronczak's driver's license, her luggage containing clothing and personal items, and a yellow bucket containing what proved to be Toronczak's 10 severed fingers and parts of her jaw with some teeth attached, as well as some loose teeth. Other seized items included female clothing and underwear that were cut apart, bloodstained flex cuffs that were cut, a bloodstained piece of cardboard, a butcher knife with Toronczak's blood and hair, a claw hammer with red stains, a blue tarp with red stains and hair, a handsaw stained with blood and biological matter, a bloodstained four-by-four piece of wood, and two pair of branch clippers, one of which had red stains.

Also recovered from the storage room were a pair of yellow Playtex gloves stained with Toronczak's blood. Defendant's fingerprints were found inside the fingertips of latex surgical gloves, which apparently had been used inside the larger bloodstained Playtex gloves. Only defendant had the keys to the storage room.

Evidence seized from defendant's apartment included four firearms and unused latex surgical gloves, yellow Playtex gloves, and flex cuffs. Also recovered were portions of a calendar for June 1993, with the dates 1, 9, and 24 cut out, and for December 1993, with the dates 7, 19, and 26 cut out.

During the initial police entries into the second and third storage rooms, defendant had been placed in a police car. While in the car, he made a cell phone call to Rose McKinney. Although McKinney denied the incident at defendant's trial, she had earlier told Russell Wittmann that defendant had called from the back of the police car to tell her that he "did it" for them.

### d. *Other Evidence*

Kelli Snider once told defendant she had killed someone, which was not true but which she said to get defendant's attention. Defendant told her he

wanted her to shoot and kill a former business associate of his named Dixon Rice. They discussed a price between $10,000 and $20,000, and he showed her where Rice lived. Snider backed out of the plan, telling defendant she had never killed before and could not do so. Defendant told her that he had not believed she would go through with it, and that he was just testing her. At the time of trial, Snider was taking medication for depression.

Once during a conversation with defendant, Loretta Peer told him she was having problems with her husband. Defendant said if she ever wanted him taken care of, he knew many bad people who could get rid of people and their body parts would never be found.

### 2. The Defense Case

The defense disputed the prosecution's case, arguing that defendant had no motive to kill any of the victims but others did, and that certain key prosecution witnesses were not credible. The defense pointed out that no physical evidence tied him to the Stadt and Albano cases, and that Rose McKinney not only had a motive to kill Toronczak but also had access to the storage room keys and was the owner of the yellow bucket containing Toronczak's partial remains.

### B. The Penalty Phase

### 1. The Prosecution Case

The prosecution relied on the circumstances of the underlying murders in advocating for the death penalty.

The prosecution also presented evidence of two uncharged batteries. One incident occurred in 1994, when defendant was in Rose Sullivan's apartment to repair something in the bathroom. Sullivan was standing behind defendant when he suddenly turned around to face her. Defendant grabbed her, lifted her top, put his hand on her breast, and started to kiss her. Sullivan pushed defendant away, and he left and never mentioned the incident.

The second incident occurred in March 1995. Defendant had entered Rose McKinney's apartment, apparently through a patio door. He was hiding in the bedroom closet when McKinney and Preston Hunter entered the apartment and went to bed, after having just returned from Mexico. From the closet defendant telephoned McKinney three times and whispered things. McKinney could not understand what was being said during the first two calls, but recognized defendant's voice the third time when he told her to get that man off her bed. McKinney then went to the living room to see where defendant

was. Defendant was very upset as he emerged from the bedroom and approached McKinney. He grabbed her and ripped off her tank top, and the two pushed each other around. The incident caused McKinney's gums to bleed, and she sustained bruising on her arm and near her ankle. Meanwhile, Hunter had left the apartment and called the police. After the police arrived and placed defendant in custody, Hunter found his shoes and basketball shorts cut up in the dishwasher.

The prosecution additionally introduced victim impact testimony from the families of the victims, including Beatrice Toronczak's mother, Ron Stadt's father, and Rose Albano's father.

### 2. *The Defense Case*

Members of defendant's biological family (Franks) and his adoptive family (Rogers) described the positive relationship between the two families as defendant grew up. The families would visit each other, and defendant never expressed resentment about living with the Rogers family. Defendant was adopted by the Rogers family because of finances, not because of anything he did. Defendant was healthy, happy, had friends and girlfriends, and was fun to be around. He was kind, gentle, respectful, and not aggressive. He was active in sports during high school, helped around the house, and held two or three jobs at one time. Defendant was a good, caring father to Nicholas.

A number of defendant's longtime friends from Idaho provided positive testimony about defendant and their experiences with him. Defendant's one-time romantic interest, Kelli Snider, testified that defendant was happy and never rude or disrespectful, and that he remained calm even when his girlfriend, Rose McKinney, would get angry with him.

Defendant presented two mental health experts. Neuropsychologist Kirsten Fleming evaluated defendant and concluded he was a bright individual with a very high-functioning brain. Dr. Fleming saw no evidence of either acquired brain damage or developmental brain damage, but noted defendant had a somewhat low frustration level. Psychiatrist Samuel Benson, Jr., performed a psychiatric evaluation of defendant and concluded he did not fit the profile of a serial killer. Given the absence of abnormal brain functioning, Dr. Benson could not explain defendant's conduct as being due to a malfunctioning brain.

## II. Discussion

### A. *Pretrial Issues*

#### 1. *Voir Dire*

Defendant contends the trial court's denial of his request for attorney-conducted and sequestered voir dire, combined with the court's inadequate voir dire of the prospective jurors regarding their death penalty views and potential racial bias, violated his state and federal constitutional rights to voir dire, a fair trial, due process, and reliable guilt, special circumstance, and penalty determinations.

#### a. *Background Facts*

Defendant's case was tried in 1997. At that time, Code of Civil Procedure section 223 provided: "In a criminal case, the court shall conduct the examination of prospective jurors." This statute gave the court discretion, "upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. . . ." (Code Civ. Proc., former § 223, as added by initiative (Prop. 115), approved by voters at Prim. Elec. June 5, 1990.) There is no dispute that this former version of the statute controlled in this case.[2]

On January 22, 1997, the trial court asked the parties to exchange their proposed jury questionnaires and to reach some agreement on questions prior to a future motions hearing. At a hearing on March 24, 1997, the trial court granted defendant's motions for use of a jury questionnaire and for open-ended, nonleading questions, but denied all other motions for individual and/or sequestered voir dire, attorney-conducted voir dire, and small group voir dire, including the prosecution's motion for attorney-conducted voir dire. The court expressed satisfaction with the prosecution's proposed jury questionnaire, but requested the defense to provide its proposed questionnaire as soon as possible. The record contains no indication that the defense ever did so.[3]

On June 9, 1997, the trial court began the jury selection process by questioning and excusing prospective jurors on hardship grounds. The court

---

[2] In 2000, Code of Civil Procedure section 223 was amended in relevant part to provide that "counsel for each party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors." (Stats. 2000, ch. 192, § 1.)

[3] Although defendant referred to an "attached juror questionnaire" in support of his motion for jury questionnaire dated February 11, 1997, no questionnaire was attached to the motion.

informed the remaining prospective jurors about the murder charges against defendant and the multiple-murder special-circumstance allegation, and of defendant's not guilty plea and denial of the allegation. After explaining some of the basic guilt phase instructions, the court emphasized the contingent nature of the penalty phase and the significance of aggravating and mitigating evidence as factors the jury would weigh to decide the appropriate sentence.

After making this presentation, the trial court stated it would be distributing questionnaires asking the prospective jurors about their respective backgrounds and views on the outlined instructions and proceedings. The court explained there were no right or wrong answers, but emphasized the importance of answering the questions completely and signing the questionnaire at the end.

Using the completed questionnaires as a starting point, the trial court asked a number of prospective jurors for more detail regarding their answers on different topics, including their death penalty beliefs. At times the court invited each side to ask questions, and it also probed certain questionnaire responses at the parties' prompting.

b. *Analysis*

Defendant claims the trial court's voir dire on the death penalty was inadequate because: (1) he was not allowed to voir dire prospective jurors at all, and (2) he was deprived of the opportunity to inquire—either through counsel or the court—about the effect of any of the circumstances of the charged crimes on the prospective jurors' bias in favor of a death verdict. He contends that his due process rights were violated and that the trial court's inadequate voir dire made it impossible to determine from the record whether any of the seated jurors held disqualifying views on the death penalty.

Defendant neither objected to the questionnaire used, nor proposed any modifications or additional questionnaire inquiries. He therefore has forfeited any claim that the questionnaire and its contents were inadequate to root out any pro-death-penalty bias on the part of the prospective jurors. (*People v. Robinson* (2005) 37 Cal.4th 592, 617 [36 Cal.Rptr.3d 760, 124 P.3d 363].) In any case, defendant's claims lack merit and do not warrant a reversal.

"It is established that a trial court 'is in the best position to assess the amount of voir dire required to ferret out latent prejudice, and to judge the responses' [citation], and hence a trial court has ' "great latitude in deciding what questions should be asked on voir dire." ' [Citation.]" (*People v. Robinson, supra,* 37 Cal.4th at p. 617; see *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46] [applying abuse of discretion

standard of review].) " 'Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal.' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1250 [32 Cal.Rptr.3d 838, 117 P.3d 544]; see *People v. Robinson, supra,* at p. 617.)

The record here clearly shows that defendant was provided opportunities to elicit information on voir dire by submitting questions for inclusion in the juror questionnaire. Despite defendant's failure to propose his own areas of inquiry, the questionnaire used in this case elicited significant details regarding the prospective jurors' backgrounds,[4] probed their views and experiences in numerous relevant areas,[5] explored their knowledge of defendant's case,[6] their attitudes about the criminal justice system, and their death penalty views, and required them to provide their responses under penalty of perjury. The court also allowed both sides to directly elicit information by asking questions of certain prospective jurors during the trial court's oral examination, and calling to the court's attention specific questionnaire responses warranting additional exploration. When certain prospective jurors requested confidentiality during the oral examination, the trial court acquiesced but included both parties in that process.

These procedures "provided an adequate basis upon which the parties were able to exercise challenges for cause as well as peremptory challenges." (*People v. Robinson, supra,* 37 Cal.4th at p. 618 [addressing similar questionnaire with followup trial court questioning]; see *People v. Carter, supra,* 36 Cal.4th at p. 1251 [voir dire found more than adequate when written juror

---

[4] The questionnaire was 20 pages long and contained a total of 118 questions, some with multiple subparts, asking for information regarding the prospective juror's name, age, area of residence, family status, educational background, occupation and employer, personal hobbies, associational memberships, military experience, law enforcement and judicial contacts, knowledge of and feelings about the criminal justice system, and prior jury service.

[5] Although some questions called for a simple "yes" or "no" answer, many others asked for explanations to affirmative or negative answers. For instance, the questions asked the prospective juror to explain any good or bad experiences with law enforcement, whether he or she could be an impartial juror, and whether he or she was a good judge of character. The questionnaire also asked the prospective juror to explain whether he or she (or any relatives or friends) had ever been arrested, charged, or convicted of a criminal offense, had ever been involved in a crime as a victim or a witness, or had ever been the victim of domestic abuse.

[6] The questionnaire probed whether the prospective juror would like to be a juror in defendant's case, or had seen, heard, or read "anything" about defendant's case, or thought psychiatric or psychological testimony had no place in the courts. The questionnaire also explored whether the prospective juror would have any difficulty in participating on a jury due to a medical or physical condition or problems at home or on the job, in viewing unpleasant photos of the deceased, in setting aside previously formed opinions about defendant's case and basing a decision entirely on the evidence presented in the courtroom, in avoiding any news coverage about the case, and in considering defendant's background when deciding on a penalty.

questionnaires were used, and each side was given very limited time to voir dire but also given the opportunity to request additional court-conducted followup questions].) Accordingly, the trial court did not err or abuse its discretion in refusing to allow additional attorney-conducted or sequestered voir dire.

In maintaining the voir dire was inadequate, defendant relies principally on *People v. Cash* (2002) 28 Cal.4th 703 [122 Cal.Rptr.2d 545, 50 P.3d 332]. There, the defendant was charged with the first degree murder of Bud Smith and the attempted murder of Susan Balestri. Because the information did not expressly allege the defendant's prior murders of his grandparents (which were introduced in the penalty phase), the trial court prohibited the defendant from inquiring whether prospective jurors would automatically vote for the death penalty if the defendant had previously committed another murder. (*Id.* at pp. 719, 721.) In holding the defense should have been permitted to probe the prospective jurors' attitude as to that circumstance, *Cash* reasoned that the "defendant's guilt of a prior murder (specifically, the prior murders of his grandparents) was a general fact or circumstance that was present in the case and that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances . . . ." (*Id.* at p. 721.)

Defendant's attempt to analogize this case to *Cash* fails. Here, the trial court specifically informed the prospective jurors that defendant was charged with three first degree murders, that the special circumstance allegation pertained to defendant's conviction of more than one murder offense, and that the death penalty decision would arise only if the jury were to find defendant guilty of first degree murder and find the special circumstance to be true. Because the prospective jurors had been fully apprised that multiple murders were at issue in the trial, the significance of that general circumstance to their death penalty views could be ascertained through the questions asking them (1) whether there were "circumstances under which you would automatically vote for the death penalty regardless of the various factors the law says you are to consider" and (2) whether, if the jury were to find defendant guilty of first degree murder and to find the special circumstance true, "will you listen to and consider all the evidence presented by the People and the defendant at the penalty phase of the trial before you reach a decision on what the penalty should be?" Thus, this case presents no parallel to *Cash*, where the trial court's refusal to allow questioning concerning the defendant's guilt of a prior murder blocked any meaningful voir dire inquiry into whether the prospective jurors' views about that significant general circumstance would cause them to automatically vote for the death penalty. (*People v. Cash, supra,* 28 Cal.4th at p. 721.)

Defendant further claims the trial court should have ascertained whether the prospective jurors' penalty phase decisionmaking would be affected by the particular circumstances that defendant was close to his three alleged murder victims, that one of the victims was pregnant, that another was the mother of his child, and that two were dismembered. We cannot agree.

■ As we have explained, "death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion." (*People v. Cash, supra,* 28 Cal.4th at pp. 721–722.) Thus, it is "not error to refuse to permit counsel to ask questions based upon an account of the facts of [the] case, or to ask a juror to consider particular facts that would cause him or her to impose the death penalty." (*People v. Jenkins* (2000) 22 Cal.4th 900, 991 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) In this case, it was more than sufficient that the prospective jurors—having been informed that defendant allegedly murdered a male friend and two former girlfriends—were asked, in various ways, whether there were circumstances under which they would impose the death penalty automatically regardless of other legally relevant factors.[7] Prospective jurors, moreover, need not necessarily be informed that a charged homicide involved dismemberment, at least in the absence of evidence that the dismemberment occurred while the victim was still alive. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1123 [63 Cal.Rptr.3d 297, 163 P.3d 4].) No error or abuse of discretion appears.

■ Finally, relying on the circumstance that he is a biracial man (having a White father and a mother from Trinidad) charged with murdering two White victims (Ron Stadt and Beatrice Toronczak) and a Filipino victim (Rose Albano), defendant complains the trial court conducted an inadequate voir dire because it asked no questions concerning the prospective jurors' potential racial biases. A defendant, however, "cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has

---

[7] Six pages of the questionnaire probed the prospective jurors' views concerning the death penalty and their ability to follow the death penalty law. Among other things, the prospective jurors were asked whether they supported or opposed the death penalty or had such conscientious objections that they would have difficulty returning a guilty verdict or a death judgment, whether they would automatically vote for the death penalty, or for a sentence of life without the possibility of parole, under certain circumstances regardless of other legally relevant factors, whether they had any religious or other beliefs that might conflict with their juror duties or affect their ability to impose either penalty, and whether there was anything else the court should know about their qualifications as jurors.

specifically requested such an inquiry." (*Turner v. Murray* (1986) 476 U.S. 28, 37 [90 L.Ed.2d 27, 106 S.Ct. 1683]; see also *id.* at pp. 46–47, fn. 2 (dis. opn. of Powell, J.); *People v. Robinson, supra,* 37 Cal.4th at p. 620.) Here, defendant's failure to offer or request specific questions regarding racial bias forfeits review of the issue on appeal.

### 2. *Denial of Defendant's Motion to Suppress*

The trial court denied defendant's pretrial motion to suppress evidence seized from his apartment, the three storage rooms below his apartment, and his vehicles. Defendant contends this ruling was erroneous and violated his state and federal constitutional rights to be free from unreasonable searches and seizures.

### a. *Background Facts*

At the hearing on defendant's motion to suppress (§ 1538.5), the trial court considered the preliminary hearing transcript, viewed photographs of the searched premises, and heard testimony from the following witnesses.

Officer Vernon Bowman of the San Diego Police Department testified that Barbara Slimak reported a missing person to him on March 6, 1996. The missing person was Biata (Beatrice) Toronczak, and Slimak indicated she was making the report on behalf of Toronczak's mother, Maria Bartosz, who lived in Germany. Slimak said Bartosz asked her to make the report, because defendant refused Bartosz's request to do so and Bartosz feared he was responsible for Toronczak's disappearance. Officer Bowman learned from Slimak that defendant and Toronczak had a five-year-old child together, and that the child sometimes lived with Toronczak in Europe and sometimes with defendant in the United States. The last known address for Toronczak was defendant's address at 7007 Saranac, apartment 209, in San Diego.

Barbara Slimak testified Bartosz told her that she never lost contact with Toronczak for more than a week, and Bartosz was very upset because it had been three or four weeks since she last spoke with her daughter on February 18, 1996. Bartosz had called several people, including defendant and Slimak, looking for Toronczak. Defendant told Bartosz that Toronczak "just took off," and that he did not know where she was. Bartosz insisted that Slimak tell the police to check the basement storage area of the apartment.

Detective Richard Carlson of the San Diego Police Department testified he worked in the missing persons unit and reviewed Officer Bowman's report around 8:00 a.m. on March 11, 1996. About 9:00 a.m., Carlson telephoned defendant and asked how long Toronczak had been gone. Defendant claimed

she had been gone about a week to a week and a half, then said he had to go, and hung up. Carlson thought defendant seemed short with him.

Just after 9:00 o'clock that morning, Detective Carlson called Slimak. Slimak told him what Bartosz had told her and said Bartosz had witnessed defendant threaten to lock Toronczak in the basement, cellar, or storage area of the residence. Bartosz felt defendant meant it and believed this was what was taking place. Slimak also believed defendant had something to do with Toronczak's disappearance.

After speaking with Slimak, Detective Carlson turned his attention to other cases, making telephone calls. He took two or three cases, including Toronczak's, when he left the station around 10:00 a.m. to contact people. After locating a missing person in a different case, Carlson arrived at 7007 Saranac around 1:35 p.m.

Detective Carlson requested that uniformed police officers meet him at the apartment complex. He was uncomfortable investigating this case without assistance, because of the unusual circumstance that people felt another person had something to do with the disappearance, and because of his telephone conversation with defendant.

Detective Carlson and the uniformed officers went to apartment 209 and saw it was the manager's unit. They knocked repeatedly and rang the doorbell, but no one answered. Carlson determined they should check for a storage area. He then spoke with residents of the complex, including Mr. and Mrs. Ortega and Russell Wittmann. Mrs. Ortega knew that a woman named Beatrice had been staying in apartment 209, but had not seen her in several weeks. The Ortegas told Carlson that defendant, who was the manager, controlled the storage rooms, and they directed Carlson to the back alleyway. Wittmann, who had been working on a BMW in front of a storage room door, told Carlson the BMW belonged to defendant.

Soon defendant drove up in a different vehicle and identified himself to Detective Carlson. Although Carlson knew from Slimak's report that Toronczak had been missing for almost three weeks, defendant maintained she had been gone for a week to a week and a half and said he thought she went to Mexico with someone. Carlson told defendant he had information that defendant had threatened to lock Toronczak in a storage room under his residence. When Carlson said he wanted to see if she was, in fact, being held there against her will, defendant replied he could not let Carlson do that. Defendant did not deny the threat or Toronczak's presence in the storage room.

When Detective Carlson mentioned the storage room threat, he saw the flat portion of defendant's neck begin to throb. Carlson asked defendant several

times for permission to enter the storage room, saying he did not understand why defendant would not want him to check on the welfare of his child's mother unless he knew that something was wrong. After telephoning and speaking with his supervisor, Lieutenant Collins, for five minutes, Carlson again asked defendant to either give him the keys to the storage room or open the door for him. Defendant refused. At this point, Carlson was "very concerned" about Toronczak's whereabouts and was "feeling more and more convinced" that Toronczak was possibly in the storage area and that he had to look for her. Carlson attempted once more to get defendant's permission to enter, without success.

Detective Carlson directed one of the uniformed officers to break the door open. They entered the first storage area, which consisted of a small entry room opening into a very large room. Carlson saw, among other things, a black nylon rope on the ground. The rope appeared to have been tied in a loop, as if to bind someone's wrist and ankles, and it looked like the ends had been cut with a sharp instrument. Carlson also saw a unisex-type purse containing defendant's business cards and what appeared to be controlled substances, peyote buttons and other narcotics.

Detective Carlson saw that the dirt floor was soft in spots and looked as if some spots could have been dug up. Having in mind a different case in which officers failed to detect a female buried in a box under the ground, Carlson spent 30 minutes or so thoroughly examining the dirt floor.

Detective Carlson directed the uniformed officers to inform defendant of what was found, and had defendant placed in a police vehicle. After updating Lieutenant Collins on the events, Carlson told defendant that he was not concerned about the drugs he found, but that he was concerned about the whereabouts and welfare of Toronczak and asked for permission to search the other two storage rooms. When defendant refused, the officers made a forced entry into the second room. Among the items they saw in that room was luggage with a tag bearing the name Beatrice Szulc, which Carlson knew was another name used by Toronczak. The luggage contained personal items of clothing and toiletries that someone would not be likely to leave behind if going on a trip.

Detective Carlson then decided to force entry into the third storage room without seeking defendant's permission. As the door to this room opened, it knocked over a large metal trash can that was on a piece of cardboard. The cardboard had a red stain and, when it was moved, Carlson observed what appeared to be dried blood, two feet in diameter, extending out on the dirt floor. A hammer, a saw, and a butcher knife were near the door, and a white painted four-by-four piece of wood stained with what appeared to be blood was lying just inside the room.

Seeing these items in plain sight, Detective Carlson believed he was looking at a crime scene. He directed the officers to seal off all three rooms and sent for the homicide team. Carlson then obtained a telephonic search warrant, and the officers reentered the storage areas and seized many items of evidence, including those previously observed.

After hearing all the testimony, the trial court denied defendant's suppression motion. The court found that Carlson acted reasonably in responding to apparently reliable information pertaining to a missing person, and that exigent circumstances justified his warrantless entry into the three storage rooms. The court also determined that the items Carlson observed when he entered the rooms had been in plain sight and properly supported the telephonic search warrant.

b. *Analysis*

Defendant contends that the initial warrantless police entries into the three storage rooms were unlawful, that exigent circumstances did not justify the entries, that Detective Carlson's decision to seek the telephonic search warrant was prompted by his observations during the illegal entries, and that use of such observations tainted the warrant-authorized searches and invalidated the resulting seizures of evidence. We disagree for the reasons below.

■ The Fourth Amendment to the federal Constitution guarantees against unreasonable searches and seizures by law enforcement and other government officials.[8] Because a warrantless entry into a home to conduct a search and seizure is presumptively unreasonable under the Fourth Amendment (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748–749 [80 L.Ed.2d 732, 104 S.Ct. 2091]), the government bears the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the entry. (*People v. Williams* (1988) 45 Cal.3d 1268, 1300 [248 Cal.Rptr. 834, 756 P.2d 221].)

As relevant here, the exigent circumstances doctrine constitutes an exception to the warrant requirement when an emergency situation requires swift action to prevent imminent danger to life. (*People v. Panah* (2005) 35 Cal.4th 395, 465 [25 Cal.Rptr.3d 672, 107 P.3d 790].) " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [Citation.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. [Citations.]" (*Mincey v. Arizona* (1978) 437 U.S. 385, 392–393 [57 L.Ed.2d 290, 98 S.Ct. 2408].) In this regard,

---

[8] In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards. (*People v. Ayala* (2000) 23 Cal.4th 225, 254–255 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

" ' "[t]here is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." ' " (*People v. Panah, supra,* at p. 465.) Generally, a court will find a warrantless entry justified if the facts available to the officer at the moment of the entry would cause a person of reasonable caution to believe that the action taken was appropriate. (*People v. Duncan* (1986) 42 Cal.3d 91, 97–98 [227 Cal.Rptr. 654, 720 P.2d 2].) On appeal, we uphold the trial court's factual findings if they are supported by substantial evidence, but independently review its determination that the search did not violate the Fourth Amendment. (*People v. Panah, supra,* at p. 465.)

■ We have previously recognized that a warrantless entry may be appropriate when the police " 'seek an occupant reliably reported as missing.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 577 [280 Cal.Rptr. 631, 809 P.2d 290].) In *Wharton,* for instance, the defendant claimed his counsel was ineffective in failing to file a suppression motion challenging a warrantless entry by Officers Fryslie and Ybarra[9] into the apartment the defendant shared with the murder victim, which had resulted in the discovery of the victim's body. There, the officers acted on the following known facts: earlier in the month, the police had responded to a domestic disturbance reported at the victim's residence; earlier on the day of the entry, the victim's neighbors had reported they had not seen her in two weeks, and a note had been left in the home asking the victim to call police, but no call was received; the police had received two calls expressing concern for her welfare; mail in the victim's mailbox indicated she had not been home; and Officers Fryslie and Ybarra had gone to the home in response to a neighbor's report that someone had been banging on the victim's front door, and they found the door unlocked. (53 Cal.3d at pp. 576–577.) The totality of these circumstances, we concluded, demonstrated an emergency situation sufficient to justify the officers' warrantless entry. (*Id.* at p. 577.) We therefore rejected the defendant's ineffective assistance claim because any suppression motion would have been denied. (*Id.* at p. 578.)

We also rejected the defendant's further contention that, even if an emergency justified the two officers' entry into the apartment, their "cutting open the plastic in which the victim's body was wrapped constituted an illegal opening of a closed container which was not justified by any emergency." (*People v. Wharton, supra,* 53 Cal.3d at p. 578.) Upon entering the victim's residence the officers discovered additional suspicious circumstances, including an unplugged phone and a suicide note the defendant

---

[9] The *Wharton* opinion indicates at times that Officers Fryslie and "Tracy" made the subject warrantless entry (*People v. Wharton, supra,* 53 Cal.3d at pp. 542, 575–576), but its analysis specifically refers to Officers Fryslie and "Ybarra" (*id.* at pp. 577–579).

wrote. When the officers then found and touched a portion of the plastic wrapping at issue, they apparently thought they had found a potential body disposal site. (*Ibid.*) As we explained, however, it was only after the officers cut away the plastic wrapping and discovered the victim's body that "the emergency generated by the reports of a missing person ceased (because the probable subject of the reports was no longer living) . . . ." (*Ibid.*) "Because there existed the possibility that the victim was still alive," we declined to fault the officers for cutting away the plastic wrapping despite their suspicion that it contained a dead body. (*Ibid.*)[10]

Similarly, in *People v. Lucero* (1988) 44 Cal.3d 1006 [245 Cal.Rptr. 185, 750 P.2d 1342], we concluded that warrantless entries into the defendant's house by several law enforcement officers were justified because of an exigency created by two missing girls. The two girls were reported missing after they went to a park and failed to return, and a fire of unknown origin had ignited in the defendant's house, located directly across the street from that park. (*Id.* at p. 1012.) After extinguishing the fire, firefighters discovered what appeared to be a large bloodstain on the living room carpet and decided it should be examined by law enforcement officers. Deputy Long and Explorer Scout Rumple were the first law enforcement personnel to enter the house without a warrant and view the bloodstain, and they immediately radioed Sergeant Anton. When Anton made his warrantless entry, he had just learned that the body of one of the missing girls was discovered in the dumpster of a neighborhood grocery store. (*Id.* at pp. 1016–1017.)

In assessing whether evidence later recovered from the defendant's house, car, and clothing should have been suppressed, we reviewed the totality of the circumstances and concluded the warrantless entries into the house by Long, Rumple, and Anton were justified: "The girls, their bodies, or clues to their location might be somewhere in the burning house. Thus, when the firefighters first arrived at the scene, Sergeant Anton advised Captain Bryant of the missing children and asked him to order his men into the burning house with oxygen equipment to look for the girls. [¶] The report of the bloodstain was another unusual circumstance adding weight to the suspicion that the house and the missing girls might be connected. The presence of blood also suggested that the children were in serious danger. At the time of Anton's entry the body of one of the girls had just been found, making it likely that the second girl was in imminent danger and making discovery of her location

---

[10] The defendant also claimed that an earlier but separate warrantless entry into the same apartment by Officer Rivas that same day was not justified by any emergency. We noted there were fewer indications of an emergency when Rivas entered, but did not address whether an emergency situation existed because Rivas did not discover any evidence during his entry. "As a result, his entry, even assuming it was improper, did not (1) lead to suppressible evidence, or (2) taint the later entry by Fryslie and Ybarra." (*People v. Wharton, supra,* 53 Cal.3d at pp. 578–579.)

even more urgent." (*People v. Lucero, supra*, 44 Cal.3d at p. 1017.) "In combination," we found, "these circumstances clearly created an emergency situation requiring swift action." (*Id.* at pp. 1017–1018; accord, *Vitek v. State* (Ind. 2001) 750 N.E.2d 346, 348–349; *State v. Carlson* (Iowa 1996) 548 N.W.2d 138, 140–143; *State v. Blades* (1993) 225 Conn. 609 [626 A.2d 273, 276–280].)

As in *Wharton* and *Lucero*, substantial evidence supports the trial court's determination here that the circumstances known to Detective Carlson established an objective emergency requiring immediate action. On March 11, 1996, Carlson received a missing person report containing apparently reliable information that Beatrice Toronczak, the mother of defendant's young child, had been missing from defendant's apartment since approximately February 18, 1996. Carlson spoke directly with Slimak, the person making the report, and she confirmed the circumstances of Toronczak's disappearance as related to her by Toronczak's mother, Bartosz. Bartosz had tried unsuccessfully to locate Toronczak through defendant and others, and she could not get defendant to report Toronczak as missing. Bartosz had previously observed defendant threaten to lock Toronczak in the basement storage area of the complex. Because Bartosz believed he meant it, she insisted that Slimak tell the authorities to look in that area for the daughter. Apart from Slimak and Bartosz, neighbors at the complex confirmed that Toronczak had not been seen for several weeks and that defendant controlled the keys to the storage rooms. The significance of the foregoing information was heightened because defendant gave Carlson wrong information about the length of time Toronczak had been missing, and he exhibited no concern over her unexplained disappearance. When Carlson mentioned defendant's threat to lock Toronczak in the basement storage area, defendant's neck started to visibly throb, adding to Carlson's concern. Defendant never denied making any threat, and he never denied that Toronczak was in any of the storage rooms when Carlson repeatedly sought permission to look there for her.

In light of the foregoing, we uphold the trial court's determination that exigent circumstances justified Detective Carlson's warrantless entries into the storage rooms, and conclude that defendant's motion to suppress was properly denied. (*People v. Panah, supra*, 35 Cal.4th at p. 465.)

Defendant argues to the contrary, contending the circumstances here did not establish the requisite emergency because: (1) there were no obvious signs of an emergency, such as moans, groans, or chemical smells emanating from the storage rooms, and there had been no gunshots or fire; (2) the mere "possibility" that Toronczak was in the storage room against her will did not justify an emergency entry; (3) before his entry, Carlson did not believe he had probable cause to obtain a warrant; (4) the information regarding

defendant's supposed threat to lock Toronczak in the basement was nonspecific and did not indicate a present emergency in the storage rooms; (5) Carlson's delays in investigating the storage rooms were not consistent with his professed belief that an emergency situation existed; and (6) even if the officers had probable cause to enter the storage rooms with a warrant, the failure to obtain a warrant made the inevitable discovery doctrine inapplicable. These contentions do not aid defendant's position.

As explained, there is no bright-line rule for determining whether exigent circumstances exist; rather, courts must approach each claim of an extraordinary situation by looking at the totality of the particular circumstances known to the searching officer. (*People v. Panah, supra,* 35 Cal.4th at p. 465.) Here, the absence of any information suggesting Toronczak was dead, defendant's noticeable lack of concern over the whereabouts of his child's mother, Bartosz's report of, and evident belief in, defendant's threat to lock Toronczak in the basement, defendant's physical reaction when Carlson mentioned that threat, and defendant's sole control over the storage rooms, all contributed to Carlson's sense of urgency about entering the storage rooms immediately to look for Toronczak, who might have been imprisoned there against her will.

Because the totality of the circumstances must be considered, the fact that certain circumstances were not present here, such as certain noises or smells, or gunshots or fire, does not defeat the finding of an emergency. (See *People v. Ortiz* (1995) 32 Cal.App.4th 286, 292–293 [38 Cal.Rptr.2d 59] ["The absence or presence of a particular factor is not conclusive."].) Moreover, the length of time Toronczak had been reported as missing, i.e., three weeks instead of only hours or days, did not negate the emergency nature of the situation in light of the other circumstances known to Carlson. (See *People v. Wharton, supra,* 53 Cal.3d at p. 577 [finding exigent circumstances where victim had not been seen for two weeks].) Finally, it makes no difference that Carlson could perhaps have acted even more quickly in trying to find Toronczak,[11] or that he subjectively believed he could not have obtained a search warrant based only on the information he possessed prior to entering the three storage rooms. That is because the relevant inquiry remains whether, in light of all of

---

[11] The record, however, supports the trial court's conclusion that Detective Carlson acted reasonably and fully consistently with his testimony that he believed an emergency situation existed. On the day in question, Carlson received and reviewed the Toronczak missing person report in the morning and within an hour telephoned both Slimak and defendant for further information. He then went to Toronczak's last known address to follow up on her case in the early afternoon, after having solved another missing person case assigned to him. Although Carlson may have spent up to 30 minutes in the first storage room before moving to the next storage room, the trial court credited his testimony that the soft spots in the dirt floor warranted a close examination to exclude the possibility that Toronczak might be buried in a box under the surface.

the circumstances, there was an objectively urgent need to justify a warrant-less entry. (*People v. Panah, supra,* 35 Cal.4th at p. 465; *People v. Ortiz, supra,* at p. 293.)

Defendant's motion to suppress was properly denied.[12]

### B. *Guilt Phase Issues*

#### 1. *LeFrere's Testimony*

Pamela LeFrere was one of defendant's friends. On February 24, 1996, which was almost a week after Toronczak's disappearance, LeFrere, defendant, defendant's young son Nicholas, and others were in the storage area directly underneath defendant's apartment. Upon seeing "some empty pits" about five feet long and two feet deep in the dirt floor, LeFrere said to defendant, "Who are you going to kill next?" Defendant did not say anything, but LeFrere noticed he "got real bug-eyed and got real nervous" and "started pacing."[13] On March 11, 1996, the police found bloodstained cutting tools and Toronczak's partial remains in the storage area.

At trial, defendant raised a hearsay objection to the evidence of his conduct in response to LeFrere's question. The trial court overruled the objection, finding the evidence admissible as an adoptive admission. (Evid. Code, § 1221.) Defendant contends this ruling constituted reversible error. We conclude the evidence did not implicate verbal expression subject to the hearsay rule.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Nonverbal conduct constitutes a "statement" that was made for purposes of the hearsay rule only if it was "intended by [the person] as a substitute for oral or written verbal expression." (Evid. Code, § 225, subd. (b).)

Here, nothing suggests that defendant intended his physical reaction to LeFrere's question to be "a substitute for oral or written verbal expression." (Evid. Code, § 225, subd. (b).) Rather, LeFrere's testimony that defendant "got real bug-eyed and got real nervous" and "started pacing" merely

---

[12] Having concluded that exigent circumstances justified Detective Carlson's entry into the storage rooms, we need not and do not discuss whether, in any event, the inevitable discovery doctrine would have allowed use of the challenged evidence.

[13] LeFrere offered the above observations during the prosecution's direct examination. On cross-examination, LeFrere added that defendant dropped his head, would not look at her, and exhaled after she asked, "Who are you going to kill next?"

described nonverbal, nonassertive, emotional behavior. (See *People v. Jurado* (2006) 38 Cal.4th 72, 129 [41 Cal.Rptr.3d 319, 131 P.3d 400] ["defendant's emotional displays were nonassertive conduct, and thus not within the hearsay rule"]; *People v. Snow* (1987) 44 Cal.3d 216, 227 [242 Cal.Rptr. 477, 746 P.2d 452] [defendant's silence upon learning of the victim's death was not a statement under the hearsay rule and was admissible to show his prior knowledge of the killing].) The evidence was not subject to the hearsay rule.

Even if nonhearsay, "[n]o evidence is admissible except relevant evidence." (Evid. Code, § 350.) That standard was met here. Defendant's conduct—consisting of acute upset at what appeared to be a flippant remark—gave rise to a reasonable inference that defendant knew killings had occurred, possibly even in the storage area, and therefore was relevant as consciousness of guilt. (See Evid. Code, §§ 210, 350; e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 129–130, 153–154 [121 Cal.Rptr.2d 106, 47 P.3d 988] [evidence of defendant's defiant reaction when ordered to provide hair and blood samples for testing was admissible to show consciousness of guilt].) Although relevant evidence may nonetheless be excluded when it creates a substantial danger of undue prejudice, confusion, or misleading the jury (Evid. Code, § 352), the evidence here posed no such risk.

LeFrere's testimony describing defendant's nonverbal conduct did not implicate the hearsay rule and was relevant to the issue of guilt without being inflammatory or misleading. It was therefore properly admitted.[14]

Having concluded that admission of the evidence was not error, we reject defendant's further contentions that the court's ruling violated his state and federal rights to due process of law, a fair trial, confrontation of witnesses, and reliable guilt, special circumstance, and penalty determinations, and that it rendered his trial fundamentally unfair.

### 2. *Admission of Victims' Photographs*

Over defendant's objection, the trial court permitted the prosecution to introduce into evidence photographs showing the three victims while they

---

[14] Although our analysis differs from that of the trial court, " 'we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

Defendant also argues that the trial court should not have instructed the jury with CALJIC No. 2.71.5 (the standard instruction on adoptive admissions), and that the instruction should have been specifically limited in application to the Albano murder count. Setting aside the fact that LeFrere's testimony did not implicate the hearsay rule, the right to appellate review of these claims has been forfeited because defendant failed to raise appropriate objections at trial. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [117 Cal.Rptr.2d 45, 40 P.3d 754] ["A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial."].)

were alive. One photograph was of Rose Albano, and the other showed Ron Stadt, Debra Stadt, and Beatrice Toronczak at a concert. Defendant contends this ruling constituted prejudicial error and violated his state and federal constitutional rights to due process, an impartial jury, a fair trial, and reliable guilt and special circumstance determinations.

■ We have recognized that "[c]ourts should be cautious in the guilt phase about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims. [Citation.] But the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant. [Citation.] The decision to admit victim photographs falls within the trial court's discretion, and an appellate court will not disturb its ruling unless the prejudicial effect of the photographs clearly outweighs their probative value. [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 331–332 [33 Cal.Rptr.3d 509, 118 P.3d 545]; see *People v. Boyette* (2002) 29 Cal.4th 381, 424 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

We conclude the trial court did not abuse its broad discretion in admitting the two challenged photographs. As the prosecution pointed out, there were three victims in the case, two of the victims were similar in appearance to two of the witnesses, all four had been girlfriends of defendant, and one victim and one witness had the same first name, Rose.[15] Given these circumstances, admission of the photographs was proper to meet the prosecution's concern that the jurors might "lose track of who these individuals are" and also to help any witnesses "identify the people that they saw in this case."[16] Moreover, the two photographs were not unduly prejudicial so as to outweigh their probative value; indeed, our review confirms the photographs were neutral and unremarkable and would not have engendered an emotional reaction capable of influencing the verdict. (See *People v. Harris, supra*, 37 Cal.4th at p. 332.) We reject defendant's claims of error and constitutional violations.

### 3. *Admission of Autopsy Photographs*

Over defendant's objections, the trial court allowed the prosecution to introduce into evidence photographs of various body parts of victims Albano

---

[15] Victim Rose Albano was defendant's former girlfriend and witness Rose McKinney was his girlfriend at the time of trial, and both were short with dark complexions. Victim Beatrice Toronczak and witness Debra Stadt were also former girlfriends of defendant, and both were blond and thin.

[16] Having reached this conclusion, we need not and do not address whether the photographs, which helped to show the similar physical appearances of the two sets of girlfriends, were relevant on the additional ground stated by the court that the case was "very, very circumstantial in nature."

and Toronczak. Four photographs showed the plastic bag containing Albano's arm and leg, and others showed Albano's arm and leg at the brushy location where they were found. Autopsy photographs showed Albano's dismembered left arm and left leg, and a part of her jaw missing teeth. Four photographs showed Toronczak's 10 fingers, jaw parts, and teeth, which were recovered from a bucket in the storage room under defendant's control. Defendant contends that none of these photographs was relevant and that all them should have been excluded under Evidence Code section 352 as more prejudicial than probative.

■■■ A trial court's "decision to admit victim photographs is a discretionary matter that we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value. [Citations.]" (*People v. Martinez* (2003) 31 Cal.4th 673, 692 [3 Cal.Rptr.3d 648, 74 P.3d 748]; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 664 [21 Cal.Rptr.3d 612, 101 P.3d 509].) "[M]urder victim photographs need not be rejected merely because they are cumulative to other evidence in the case. [Citation.]" (*People v. Martinez, supra*, at p. 692; see *People v. San Nicolas, supra*, at p. 665.)

The challenged photographs had significant probative value. The Albano photographs showed the location where her body parts were found. They also showed that markings on Albano's arm and leg were consistent with them having been removed from her torso with the handsaw found in the third storage room under defendant's apartment, and that the tie mark on Albano's wrist could have been made by the black nylon rope found in the first storage room or by a plastic tie similar to those found cut up and stained with Toronczak's blood in the third storage room.

Comparisons of the Albano and Toronczak photographs showed that the jaw parts of both women were missing teeth. These photographs were relevant in light of a conversation that defendant had with Debra Stadt after Ron Stadt disappeared in June 1993 and soon after Albano disappeared around Christmas that same year. In that conversation, Debra Stadt told defendant that her estranged husband had extensive dental records and could be identified by his teeth. Defendant told Debra Stadt "that was the only thing that he forgot" and that "[i]t was the only mistake he made." As the prosecution argued, defendant's comments could be construed to mean he forgot to remove Stadt's teeth after killing him so as to prevent identification of his body, but consistent with what the photographs showed, defendant sought to remove his victims' teeth the next two times he killed.

By showing that the physical details of the body parts tended to support a connection between defendant and the Albano and Toronczak murders, the

challenged photographs were relevant to the ultimate determination of guilt. (See *People v. San Nicolas, supra,* 34 Cal.4th at p. 665.) The record discloses that the trial court duly weighed their probative value and prejudicial effect, and our own examination of the photographs confirms that, while gruesome, they were neither unduly so nor inflammatory. Finally, although the photographs largely served to corroborate testimonial evidence, that circumstance alone did not compel their rejection. (See *ibid.*; *People v. Martinez, supra,* 31 Cal.4th at p. 692.)

### 4. *Loretta Peer Incident*

Loretta Peer was in the process of getting a divorce when she met defendant in January 1993. Defendant was interested in Peer, and asked for her telephone number. He called her, had cards delivered to her work address, and left chalk or pencil messages on her car windows. When Peer testified that defendant left a note "inside of my car on my steering wheel when the car was totally sealed," defendant objected on grounds of relevance. The court overruled the objection, and the prosecutor elicited Peer's testimony that defendant must have broken into her locked car, but she did not see any damage. On appeal, defendant contends the court erroneously overruled his relevance objection and admitted prejudicial evidence that he had committed an uncharged criminal act.

Evidence of a defendant's prior criminal act generally is inadmissible when offered to prove the defendant's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) Such evidence is admissible, however, when relevant to prove some fact in issue (such as motive, intent, knowledge, identity, or the existence of a common design or plan), other than a disposition to commit such an act. (Evid. Code, § 1101, subd. (b).)

At trial, the prosecution was not asked to explain the relevance of the challenged testimony. In this court, respondent observes that, in light of the circumstance that Peer initially did not respond to defendant's calls, cards, and messages, it was reasonable to infer that defendant's motive for the break-in was to exercise control over Peer by leaving a message inside her locked car. In respondent's view, "[t]his tended to establish [defendant's] method of solving problems by controlling the situation and being the individual in charge." While acknowledging that breaking into a car to leave a note is not committing murder, respondent argues "it is reasonable to infer [defendant's] motive to kill resulted from the seriousness of the problems the victims[] presented for [defendant] and the closer relationship between [defendant] and the three murder victims."

We need not decide whether the trial court ruled erroneously, because any error was harmless. Peer's reference to the break-in incident was very brief,

and she expressed no fear or negative feelings about the incident. To the contrary, Peer testified she subsequently became friends with defendant and went to dinners, movies, and shows with him. The prosecution made no mention of the break-in incident during its closing argument.

At the same time, the circumstantial and physical evidence pointing to defendant's guilt was overwhelming. Defendant was close to all three murder victims and had both the motive and the opportunity to kill each one.

With regard to Ron Stadt, the prosecution's case against defendant included evidence that Stadt had intended to use evidence of defendant's affair with Stadt's estranged wife Debra in his child custody dispute with Debra. Debra last saw Stadt in the alley at defendant's apartment complex on June 24, 1993, when defendant told Debra in an urgent tone of voice to leave the area. Stadt was never seen again. Defendant spoke of Stadt's disappearance to friends, saying at various times that Stadt was killed in a fight, that he drove off into the sunset, that he would not be bothering Debra anymore, and that he was mountain lion food. After Stadt vanished, defendant was in possession of Stadt's radar detector and car key, and he made calls to unlisted telephone numbers that had not been shared with him but had been given to Stadt.

On the Rose Albano murder count, the case included evidence that defendant wanted Albano, who was pregnant, to get an abortion and move out of his apartment. He did not want to marry Albano or be responsible for her children. Defendant reported Albano missing in two suspicious calls to the San Diego Police Department. In the first call, defendant stated Albano lived at 7007 Saranac, apartment 209 (defendant's address) and claimed he last saw her on December 12, 1993, at around 1:00 p.m. In the second call, he gave a different address for Albano, and said he last saw her on December 21, 1993, at 7:00 a.m. Defendant never showed any concern over Albano's disappearance and, as with Stadt, defendant gave different explanations as to where she went. On December 29, 1993, the day Albano's partial remains were found, defendant told his sister that Albano's mother told him Albano's body parts had been found, even though the authorities did not inform the Albano family concerning identification of the remains until January 27, 1994. After Albano had been found murdered and the police had interrogated defendant, he gave Kimberly Skolte his money, his airline ticket to Poland, his ATM card with his PIN, his mailbox keys, and his passport, because he was concerned he was a suspect.

The case against defendant on the Beatrice Toronczak murder count was especially strong. Defendant did not care for the way Toronczak was raising their son, Nicholas. When Toronczak returned from Poland in February 1996, she moved into defendant's apartment and displaced defendant's then live-in

girlfriend, Rose McKinney, who had to move out. As with the previous two victims, defendant told friends different things about Toronczak's disappearance, e.g., that she ran off with a Mexican man to the Mexican border, that she probably went to Germany, and that she probably went to Las Vegas or to Poland. Defendant was not concerned that his child's mother had vanished without a word, and he refused Toronczak's mother's request to file a missing person report. On March 11, 1996, Toronczak's jaw parts and 10 severed fingers, as well as bloodstained tools including a handsaw, a butcher knife, and a hammer that apparently had been used to dismember her body, were found in the third storage room underneath defendant's apartment. Only defendant had the keys to the storage room, and his fingerprints were found inside latex surgical gloves, which apparently had been inside other gloves stained with Toronczak's blood. McKinney later claimed defendant told her that he "did it" for them.

Results of the autopsies also linked the murders to defendant. Specifically, Albano's severed arm and leg showed cuts that could have been made with the same handsaw found in the storage room, and a mark on her wrist indicated binding, perhaps by black nylon rope or by a plastic tie similar to those found stained with Toronczak's blood. Moreover, the jawbones of both Albano and Toronczak were found separated from their bodies, and both were missing teeth. When Debra Stadt told defendant that her estranged husband had extensive dental records and could be identified by his teeth, defendant remarked "that was the only thing that he forgot" and "[i]t was the only mistake he made." As the prosecution argued, it was reasonable to construe the circumstances as indicating that, although defendant forgot to remove Stadt's teeth to hinder identification of his body, he remembered this detail when he later killed Albano and Toronczak.

In sum, a reversal is unwarranted. Given the strength of the prosecution's case, which included significant physical evidence, a mountain of circumstantial evidence, and defendant's own inconsistent and self-incriminating statements, it is not reasonably probable that a different result would have been obtained absent Peer's brief mention that defendant broke into her car to leave a note. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26 [82 Cal.Rptr.3d 323, 190 P.3d 664]; *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243].)[17] For the same reasons, any erroneous admission of the testimony was

---

[17] Defendant also complains the prosecution relied on Peer's break-in testimony to bolster its penalty phase argument that he was "scary." But his failure to object to the prosecution's argument forfeits review of this claim. In any event, the prosecution's mention of the incident could not have been prejudicial when considered in context. During the penalty phase, the prosecution introduced evidence of two uncharged batteries: one against Rose McKinney and one against Rose Sullivan. When arguing that defendant entered McKinney's locked house when she was not there, the prosecution noted by reference to the Peer break-in that the entry

harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; see *People v. Lindberg, supra,* at p. 26.)

### 5. *Failure to Instruct on Voluntary Manslaughter*

With respect to the count involving Ron Stadt, the trial court instructed the jury on first and second degree murder. The court, however, denied defendant's request to give five voluntary manslaughter instructions based on provocation/heat of passion. (CALJIC Nos. 8.37 [manslaughter—defined], 8.40 [voluntary manslaughter—defined], 8.50 [murder and manslaughter distinguished], 8.55 [homicide—cause—defined], 8.72 [doubt whether murder or manslaughter].) Defendant claims this omission constituted prejudicial error and violated his state and federal constitutional rights to due process, a fair jury trial, presentation of a defense, and reliable guilt and special circumstance determinations.

■■■ "In a criminal case, a trial court must instruct on general principles of law relevant to the issues raised by the evidence, even absent a request for such instruction from the parties. [Citation.] The obligation extends to instruction on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present, but not when there is no evidence that the offense committed was less than that charged. [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664 [80 Cal.Rptr.3d 126, 187 P.3d 970].) Here, the trial court was required to instruct on the provocation/heat of passion theory of manslaughter as a lesser included offense of the charged murder, if substantial evidence supported that theory. (*Ibid.*)

■■■ " 'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to

---

was not an isolated incident. The trial court, however, specifically instructed the jurors that the uncharged batteries against McKinney and Sullivan were the only two prior criminal acts they could consider in aggravation. The prosecution did not argue otherwise, and it is not reasonably possible that the outcome would have been different had there been no mention of the Peer incident.

arouse the passions of the ordinarily reasonable man." ' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215–1216 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

Here, the sum of the evidence bearing on the last known interaction between defendant and Stadt was as follows. Defendant and Ron Stadt were once best friends. By April or May 1993, Stadt had learned of an affair between his estranged wife, Debra, and defendant. Besides being hurt and in disbelief, Stadt decided he would use evidence of the affair in his dispute with Debra over child custody. On June 24, 1993, Stadt had a telephone conversation with defendant between 4:00 and 5:00 p.m. The conversation was "heated" and involved "some arguing." After the conversation, Stadt said he was going over to defendant's apartment to retrieve some personal items—possibly jewelry—left there by Debra. That same day, about 6:20 p.m., Debra saw defendant and Stadt separately drive up to defendant's apartment building. Defendant told Debra in a "fairly urgent" tone to leave, and she did. He later told Debra that he and Stadt "talked" that evening. During a subsequent interview with a deputy sheriff, defendant said that when Stadt arrived at his place on June 24, 1993, Stadt blamed him for the separation from Debra and accused defendant of being the reason why Stadt could not see his children anymore. According to Ash Darwish, defendant was ordinarily a very calm person, but on one occasion when defendant was tinting car windows, Darwish saw him go "ballistic in a phenomenal way" and destroy everything in front of him.

Whether considered separately or together, the foregoing did not furnish substantial evidence to support a determination that, if defendant killed Stadt, he did so under immediate provocation or in the heat of passion. Significantly, there was no evidence, testimonial or otherwise, indicating that Stadt did anything to provoke a violent or impassioned response from defendant when the two met at defendant's apartment complex, or that Stadt acted in any manner to trigger such a passion as would naturally be aroused in the mind of an ordinarily reasonable person. Evidence that defendant once lost his temper in an unrelated incident did not constitute substantial evidence that he lost control on the evening in question. "Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense." (*People v. Wilson* (1992) 3 Cal.4th 926, 941 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Indeed, even if the two men argued earlier over the telephone, and even if Stadt continued to be angry at defendant over his separation and child custody problems, any conclusion that defendant suddenly and immediately reacted to something Stadt said or did is undermined by the absence of any

evidence of on-the-spot explosion of violence and by the circumstance that Stadt vanished without a trace.[18]

On this record, the trial court had no duty to instruct the jury on voluntary manslaughter, and no state or federal constitutional error occurred.

### 6. *CALJIC No. 2.06*

Over the defense's objection, the trial court instructed the jury with CALJIC No. 2.06, as follows: "If you find that the defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence or by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." Defendant contends this was prejudicial error and a violation of his federal constitutional rights to due process and a fair trial. These contentions lack merit for the reasons below.

There was evidence here that the fingers and parts of the jawbone (with some teeth attached and some loose) had been removed from Toronczak's corpse. Although the rest of the body was missing, Toronczak's fingers and jaw parts were found together in the third storage room underneath defendant's apartment. Only defendant had the keys to that room, and in that same location defendant's fingerprints were found on the inside of latex gloves that fit inside other gloves stained with Toronczak's blood. Because the jury could reasonably infer from this evidence that defendant attempted to conceal evidence by removing identifying body parts from Toronczak's corpse before disposing of it, CALJIC No. 2.06 was properly given.

Contrary to defendant's assertion, the instruction did not violate his rights to due process and a fair trial. As we have recognized, "CALJIC No. 2.06 benefits the defense by 'ma[king] clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior.' [Citations.]" (*People v. Farnam, supra,* 28 Cal.4th at p. 165.)[19]

---

[18] In his reply brief, defendant additionally points to evidence that Gerald Kurpet testified that (1) Kurpet witnessed an incident in 1992 when Stadt became "edgy" because Debra Stadt was paying attention to defendant and siding with defendant in a conversation rather than with Stadt; and (2) defendant told Kurpet that Stadt was killed in a fight. The Kurpet testimony adds nothing of consequence to the analysis.

[19] Our conclusion is consistent with *People v. Mason* (1991) 52 Cal.3d 909 [277 Cal.Rptr. 166, 802 P.2d 950], which held in an analogous context that the need for consciousness of guilt

### 7. *Judge Link's Temporary Absence*

Judge Frederic Link of the San Diego County Superior Court was the judge presiding over defendant's trial. On the afternoon of June 30, 1997, Judge Link was absent from the trial due to "business in Sacramento."

Judge Christine Pate was presiding in his absence when the jury returned its signed guilt phase verdict forms finding defendant guilty of the first degree murder of Toronczak (count one) and the first degree murder of Albano (count three) and finding him not guilty of the second degree murders of those two victims. Out of the presence of the jury, Judge Pate discussed with both sides the jury's apparent confusion regarding the verdict forms. It was agreed that Judge Pate would explain to the jury that, once it had filled out the verdict forms finding defendant guilty of the first degree murders of Albano and Toronczak, the verdict forms for second degree murder should not have been filled out as to those victims. It was also agreed that Judge Pate would ask the foreperson what his intent was in filling out the forms, and if any of the other jurors disagreed with his explanation, then the jury would be sent back for further deliberations. After Judge Pate ascertained it was the jury's intention to return guilty verdicts as to first degree murder on counts one and three, she granted defendant's motion to strike the not guilty verdicts as to second degree murder on those two counts. Judge Pate also clarified her ruling was without prejudice in the event Judge Link had any further thoughts on the matter. When Judge Link returned the following Monday, July 7, 1997, he apologized to the jury for being absent, stated he was out of town on business in Sacramento, and noted the verdict issue had been resolved.

Defendant contends on appeal that Judge Pate's substitution in Judge Link's absence was improper under section 1053, and that the substitution violated his state and federal constitutional rights to a jury trial and federal right to have the continuous presence of the same judge throughout his entire trial. Defendant claims the error was structural and reversible per se.

█ Section 1053 provides in relevant part: "If after the commencement of the trial of a criminal action or proceeding in any court the judge or justice presiding at the trial shall die, become ill, or *for any other reason be unable to proceed with the trial,* any other judge or justice of the court in which the

---

instructions " 'does not change just because identity is also an issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.' " (*Id.* at p. 943.) Because there was evidence that defendant removed identifying body parts from Toronczak's corpse before disposing of it, CALJIC No. 2.06 properly instructed the jury it could consider such actions as tending to show a consciousness of guilt.

trial is proceeding may proceed with and finish the trial . . . ." (Italics added.) A substitution pursuant to section 1053 does not require the defendant's consent or violate his or her due process rights. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1211–1212 [275 Cal.Rptr. 729, 800 P.2d 1159].) One court has held that section 1053 was violated when a substitution occurred so that the presiding judge could attend to preexisting supervisory court responsibilities. (*People v. Truman* (1992) 6 Cal.App.4th 1816, 1825–1827 [9 Cal.Rptr.2d 138].)

Respondent does not contend Judge Link was "unable to proceed" within the meaning of section 1053. As respondent asserts, however, defendant forfeited the issue by failing to object when: (1) Judge Link announced on June 27, 1997, that he would be absent on the afternoon of June 30, 1997, and that he planned to have another experienced judge sit in for him that afternoon; (2) Judge Pate took the bench on June 30; and (3) Judge Link explained, upon his return, that he had been out of town on business in Sacramento and noted the verdict issue had been resolved. We reject defendant's effort to secure "a second bite at the apple" by belatedly raising his section 1053 objections. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 429 [64 Cal.Rptr.3d 721, 165 P.3d 512].)[20]

Even had defendant's state and federal contentions been preserved for review, he would not be entitled to relief. In the first place, a midtrial substitution of judges does not implicate either the federal or the state constitutional right to jury trial. (*People v. Espinoza* (1992) 3 Cal.4th 806, 829 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

Moreover, even assuming Judge Link's business trip did not amount to an inability to proceed under section 1053, any possible error in his substitution was harmless. Judge Pate presided over the guilt phase deliberations for half a day, and she made no evidentiary or instructional rulings that would have required familiarity with the particulars of defendant's case. In receiving the verdicts, Judge Pate consulted with both parties and obtained their agreement to clarify whether the jury intended to find defendant guilty of the first degree murders of Albano and Toronczak. Once she secured that clarification, she committed no error in granting defendant's motion to strike the two second degree murder verdicts without prejudice. On this record, any conceivable error in the substitution of Judge Link was harmless beyond a reasonable

---

[20] Defendant offers no legal authority, and we are aware of none, supporting his contention that a criminal defendant must make a personal, knowing, and intelligent waiver of the right to have the same judge preside over the entire trial.

doubt. (*People v. Halvorsen, supra,* 42 Cal.4th at p. 429 [applying *Chapman* harmless error standard].)[21]

### C. *Penalty Phase Issues*

#### 1. *Sentencing for Second Degree Murder*

The jury convicted defendant of three homicides—the first degree murders of Albano and Toronczak, and the second degree murder of Stadt—and also found true the single multiple-murder special-circumstance allegation. At the penalty phase, the jury was given two alternative verdict forms reflecting the choice of imposing either a single sentence of death or a single sentence of life without the possibility of parole.[22] The verdict forms did not reflect that the identified sentence would apply only to the two first degree murders of Albano and Toronczak, and not to the second degree murder of Stadt.

Defendant does not contend it was error to allow the jury to render a single death verdict, rather than individual verdicts for each of the two capital crimes. Rather, he asserts that the forms provided, combined with the court's failure to specify in its instructions the counts on which the penalty decision was to be based and with the prosecution's argument describing the case as being about "three murders," misled the jury into returning a death sentence for all three murders, including the second degree murder of Stadt. According to defendant, the jurors were obligated to determine "whether or not to impose the death penalty for two first-degree murders made worse by the fact that there were three homicides altogether." In claiming the jurors were instead allowed to sentence him to death "for three homicides, including one second-degree murder," defendant asserts the error violated his state and federal constitutional rights to a fair trial, due process, a reliable penalty determination, and meaningful appellate review. We are not persuaded.

In accordance with the mandate of section 190.3, the trial court instructed the jury that, in reaching its penalty decision, it must consider the various factors in aggravation and in mitigation, including the circumstances of the crime of which defendant was convicted and the special circumstances found true. (§ 190.3, factor (a); CALJIC No. 8.85.) Consistent with section 190.3

---

[21] An improper substitution of a judge during a criminal trial is not a structural defect that is reversible per se. (*People v. Halvorsen, supra,* 42 Cal.4th at p. 429.)

[22] One verdict form read: "We, the jury in the above-entitled cause, determine that the penalty shall be death." The other form read: "We, the jury in the above-entitled cause, determine that the penalty shall be confinement in the state prison for life without possibility of parole."

and the court's instructions, the prosecution properly reminded the jury, without any defense objection, that it had "proved three murders, three of them." After reviewing the circumstances of the Stadt and Albano murders, the prosecution argued, also without objection, that defendant deserved the death penalty for those two murders and the multiple-murder special-circumstance finding. The prosecution then argued that if that was not enough for the jury to vote for death, then there was another murder to consider, that of Toronczak, and that together the three murders certainly warranted a death verdict.[23] The instructions were correct, the prosecution's arguments were appropriate, and the jury was not misled. On this point, no state law or constitutional error occurred.

Defendant is correct, however, that the trial court entered a judgment that erroneously imposed only a single sentence—death—as to all three murder counts. Respondent agrees and acknowledges that a death sentence is not authorized for second degree murder. Accordingly, pursuant to our statutory power to modify an unauthorized sentence (§ 1260), we vacate the death sentence imposed on the second degree murder count (count two) and order the judgment modified to reflect the appropriate sentence for that count, which is a state prison term of 15 years to life. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1048 & fn. 7 [63 Cal.Rptr.3d 82, 162 P.3d 596].) Contrary to defendant's suggestion, we find it entirely unnecessary, given the circumstances of this case, to remand the matter to the trial court to allow consideration whether the authorized sentence on the second degree murder count should be stayed.

## 2. *Failure to Give Clarifying Jury Instructions*

Defendant contends the trial court gave contradictory and erroneous instructions that were confusing and failed to give the jury all the tools necessary to make the penalty determination. In particular, he faults the court for not having specifically informed the jury which of the guilt phase instructions applied to the penalty phase, such as, for example, CALJIC No. 2.01 (sufficiency of circumstantial evidence—generally), CALJIC

---

[23] The prosecution argued: "Then you add in Beatrice Toronczak. Now what do you do? You still give him life without parole, if you do, the statement is that was a freebie, she doesn't count. He gets no more additional punishment for that. [¶] Multiple murders count with two. He has done three. He has gone beyond the minimum. Beatrice Toronczak counts. What he did to her and her family counts. She was another one who loved him and trusted him and gave him a child, hoped at one point, it sounds like, to be a family with him and never came to be and he brutally murdered her or at least brutally disposed of her. And this is after he had gotten away, committed and gotten away with two murders."

No. 2.09 (evidence limited as to purpose), CALJIC No. 2.22 (weighing conflicting testimony), and CALJIC No. 2.82 (hypothetical questions in examining experts). This error, he claims, deprived him of his state and federal constitutional rights to due process, a fair trial, and a reliable penalty determination.

Defendant did not raise this claim below and therefore has forfeited its review. (*People v. Rundle* (2008) 43 Cal.4th 76, 188 [74 Cal.Rptr.3d 454, 180 P.3d 224].) Even were we to reach the merits of the claim, we would find no error.

Here the trial court instructed the jury that "unless otherwise indicated . . . all applicable instructions given in the guilt phase will apply." The court additionally instructed the jury to disregard only those guilt phase instructions that conflicted with the penalty phase instructions the court was about to give.[24] Having instructed as such, the court was not obligated to repeat all the guilt phase instructions that applied to the penalty phase. (See *People v. Rogers* (2006) 39 Cal.4th 826, 905 [48 Cal.Rptr.3d 1, 141 P.3d 135] [distinguishing those situations in which a penalty phase jury was instructed, *without limitation*, to disregard all other instructions given in other phases of the trial]; see *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1067 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Cooper* (1991) 53 Cal.3d 771, 846 [281 Cal.Rptr. 90, 809 P.2d 865].)

■ Moreover, where, as here, none of the generic CALJIC instructions is, by its terms, limited to the guilt phase, and none is contradicted by the penalty phase instructions, a reasonable jury would correctly assume those instructions continue to apply at the penalty phase. (*People v. Sanders* (1995) 11 Cal.4th 475, 561 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Wharton, supra*, 53 Cal.3d at p. 600.) In sum, there is nothing to suggest the jury was misled into believing that instructions such as CALJIC Nos. 2.01, 2.09, 2.22,

---

[24] Both before and after the penalty phase arguments, the trial court informed the jury it would be giving a set of instructions to guide its penalty determination. The court's preliminary instruction indicated the final instructions would include some of the guilt phase instructions because they "may be of some assistance in the general evaluation of the evidence that you have heard in the penalty phase," and further specified that "unless otherwise indicated as with the sympathy instruction you will hear, all applicable instructions given in the guilt phase will apply." When it delivered the final penalty phase instructions, the court stated in relevant part: "You will now be instructed as to all of the law that applies in the penalty phase of this trial. [¶] You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law as I state [it] to you. Disregard all other instructions given to you in other phases of this trial *which conflict with these instructions.*" (See CALJIC No. 8.84.1, as modified by italicized clause.) Contrary to defendant's assertion, there was no error or ambiguity in these instructions.

and 2.82 did not continue to apply at the penalty phase, and the trial court did not err in failing to give these instructions a second time.[25]

### 3. *Refusal of Defendant's Lingering Doubt Instruction*

Defendant contends the trial court's refusal to give a lingering doubt instruction constituted prejudicial error and violated his state and federal constitutional rights. As the concept is sufficiently covered in CALJIC No. 8.85, we have consistently rejected state and federal law claims that a trial court must specifically instruct on lingering doubt. (*People v. Zamudio, supra*, 43 Cal.4th at p. 370; *People v. DePriest* (2007) 42 Cal.4th 1, 59–60 [63 Cal.Rptr.3d 896, 163 P.3d 896] [and cases cited].)

### 4. *Court's Instruction with CALJIC No. 8.85*

Defendant contends the trial court violated both state law and the federal Constitution by instructing the jury with an incorrect version of CALJIC No. 8.85, the standard instruction describing the factors in aggravation and mitigation for consideration of the penalty.[26] According to defendant, by

---

[25] As relevant to the aggravating evidence of the two uncharged batteries (§ 190.3, factor (b)), we do not agree a reasonable jury would have rejected the continued applicability of CALJIC No. 2.01, which generally instructed on the sufficiency of circumstantial evidence to support a finding of guilt. Although the court did not reinstruct with CALJIC No. 2.01, it specifically repeated CALJIC No. 2.00, which described the differences between direct and circumstantial evidence and the acceptability of both as a means of proof. The court also instructed with CALJIC No. 8.87, regarding the requirement of proof beyond a reasonable doubt of other criminal activity offered in aggravation, and with CALJIC Nos. 16.140, 16.141, and 16.142, pertaining to the elements of the crime of battery. Additionally, the court repeated CALJIC No. 2.90, which defined the reasonable doubt burden of proof.

[26] The trial court orally gave the following version of CALJIC No. 8.85: "Now, in determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed. You *may* consider, take into account and be guided by the following factors, if applicable: [¶] A, the circumstances of the crime of which the defendant was convicted in this present proceeding and the existence of any special circumstances found to be true. [¶] B, the presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involve the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] C, the presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings. [¶] D, whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. [¶] E, whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] F, whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] G, . . . whether or not the defendant acted under extreme duress or under the substantial domination of another person. [¶] H, whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or

telling the jury it *"may* consider, take into account and be guided by" the statutory factors in aggravation and mitigation, rather than instructing that it "shall" do so, the court failed to require the jury to consider his case in mitigation when determining his penalty. No prejudicial error occurred.

We determine the correctness of jury instructions " ' "from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citation.]' " (*People v. Smithey* (1999) 20 Cal.4th 936, 987 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Here, even assuming the court misspoke in reading that one sentence of CALJIC No. 8.85 to the jury, the court twice read a correct version of CALJIC No. 8.88, once before and once after the closing arguments, which instructed on essentially the same point: *"You shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed."* (Italics added.)[27] Correct versions of both CALJIC

---

defect or the effects of intoxication. [¶] I, the age of the defendant at the time of the crime. [¶] J, whether or not the defendant was an accomplice to the offense and his participation in the commission of his offense was relatively minor. [¶] K, any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." (Italics added.) The trial court's mistake appears at the outset of the foregoing instruction, in italics, and consisted of incorrectly saying the word "may" in place of "shall."

[27] Following counsel's argument, the court instructed the jury with CALJIC No. 8.88 as follows: "Ladies and gentlemen, it is now your duty to determine which of the two penalties, death or confinement in state prison for life without possibility of parole, shall be imposed on the defendant. [¶] You have now heard the evidence. You have now heard the arguments of counsel. You shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition, or event attending the commission of the crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. [¶] A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as extenuating circumstances in determining the appropriateness of the death penalty. [¶] The weighing of the aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side on an imaginary scale or arbitrary assignment of weight to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the factors you are permitted to consider. [¶] In weighing the various circumstances, you must determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole. [¶] You shall now retire to deliberate on the penalty. The foreperson previously selected may preside over your deliberations or you may choose a new foreperson. [¶] In order to make a determination of the penalty, all 12 jurors must agree. Any verdict that you reach must be dated and signed by your foreperson on a form that will be provided and then you shall return it to this courtroom."

No. 8.85 and CALJIC No. 8.88 were provided to the jury in written form, and were available to resolve any confusion over the matter.

Apart from the court's instructions, the prosecution correctly argued to the jury that it must consider the statutory aggravating and mitigating factors in making the penalty decision: "There are factors that the court gave you yesterday that you shall be instructed, have been instructed, that *you have to use when you determine what is the appropriate punishment*, the greater or the lesser. The factors that were provided by the court yesterday I have put on a chart here. . . . [¶] These are what are called the aggravating and mitigating factors that *you are supposed to be guided by*. Aggravating are the bad things; mitigating are the good things, sympathetic things or good deeds he has done. And this list basically gives you the law in this area. [¶] You are to consider all of the evidence that you have been presented in this case, all of the evidence in the guilt phase, direct and cross-examination of every witness, just as you're to consider everything in the penalty phase, direct and cross-examination. [¶] Your decision is this case is to be based upon the evidence, the testimony that you heard, not guesses, hunches, fears, unwillingness to do the right thing." (Italics added.)

Here, each side focused on various mitigating circumstances present in the case, including defendant's lack of prior convictions, the absence of criminal conduct for the first 33 years of defendant's life, the respect for women and elders that defendant showed as a boy, defendant's military service, defendant's love for his son Nicholas, the family members who loved defendant and pleaded for his life, and the inconsistencies and contradictions in the evidence that potentially raised a lingering doubt as to defendant's guilt. As each side reviewed the evidence, the jury was repeatedly reminded to weigh the circumstances, both the mitigating and the aggravating, to reach its penalty decision.

Considering the oral and written instructions as a whole, in conjunction with the parties' arguments, we find there was no reasonable likelihood the jury was led to believe it could disregard defendant's mitigating circumstances in determining the appropriate penalty. (See *People v. Rundle, supra*, 43 Cal.4th at p. 189; *People v. Pollock* (2004) 32 Cal.4th 1153, 1191–1193 [13 Cal.Rptr.3d 34, 89 P.3d 353].)

Defendant additionally contends his federal constitutional rights were violated because the penalty instructions, and CALJIC No. 8.85 specifically, failed to advise which of the listed sentencing factors were aggravating,

When the court earlier instructed on CALJIC No. 8.88 before closing arguments, the second paragraph reflected what the jury's duty would be after having heard the arguments of counsel, and the last two paragraphs were left out.

which were mitigating, or which could be either depending on how the jury appraised the evidence, and failed to delete inapplicable statutory mitigating factors. We have repeatedly rejected these contentions (e.g., *People v. Zamudio, supra,* 43 Cal.4th at pp. 372–373 [and cases cited]; *People v. Farnam, supra,* 28 Cal.4th at pp. 191–192 [and cases cited]), and defendant offers no persuasive reason for their reconsideration.

Finally, defendant argues the trial court erred in failing to instruct the jury it could not consider aggravating factors that were not enumerated in the statute. We have consistently rejected this argument (e.g., *People v. Boyer* (2006) 38 Cal.4th 412, 486 [42 Cal.Rptr.3d 677, 133 P.3d 581] [and cases cited]; *People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]), and do so again here.

### 5. *CALJIC No. 8.88*

In defendant's view, the slightly modified version of CALJIC No. 8.88[28] used at his trial was constitutionally deficient for several reasons. We conclude there was no substantive difference between the standard instruction and the modified version given below, and therefore adhere to our decisions that have rejected similar claims, as follows.

CALJIC No. 8.88 is not constitutionally flawed or impermissibly vague because (1) it uses the phrase "so substantial" to compare aggravating factors with the mitigating factors (*People v. Parson* (2008) 44 Cal.4th 332, 371 [79 Cal.Rptr.3d 269, 187 P.3d 1] [and cases cited]; *People v. Salcido* (2008) 44 Cal.4th 93, 163 [79 Cal.Rptr.3d 54, 186 P.3d 437] [and cases cited]); (2) it uses the term "warrants" instead of "appropriate" (*People v. Page* (2008) 44 Cal.4th 1, 56 [79 Cal.Rptr.3d 4, 186 P.3d 395]; *People v. Harris* (2008) 43 Cal.4th 1269, 1321–1322 [78 Cal.Rptr.3d 295, 185 P.3d 727] [and cases cited]); (3) it fails to instruct the jury that a life sentence is mandatory if the aggravating factors do not outweigh the mitigating factors (*People v. Parson, supra,* at p. 371 [and cases cited]; *People v. Page, supra,* at p. 57 [and cases cited]); (4) it fails to instruct that a verdict of life in prison could be returned even if the circumstances in aggravation outweighed those in mitigation (*People v. Page, supra,* at p. 58 [and cases cited]; *People v. Zamudio, supra,* 43 Cal.4th at pp. 372–373); and (5) it fails to instruct that neither party in a capital case bears the burden of persuasion on the penalty determination (*People v. Harris, supra,* at p. 1322 [and cases cited]; *People v. Zamudio, supra,* at p. 372).

---

[28] See *ante,* footnote 27.

### 6. *Intercase Proportionality*

Defendant contends the failure to provide for intercase proportionality review in capital cases violates his Eighth Amendment right under the federal Constitution to be protected from the arbitrary and capricious imposition of capital punishment. As defendant acknowledges, we have rejected this contention many times before. (*People v. Parson, supra,* 44 Cal.4th at pp. 368–369 [and cases cited]; *People v. Page, supra,* 44 Cal.4th at p. 61 [and cases cited].) The same goes for the contention that the lack of intercase proportionality review violates a capital defendant's Fourteenth Amendment right to equal protection of the law. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 227 [79 Cal.Rptr.3d 125, 186 P.3d 496] [and cases cited]; *People v. Page, supra,* at p. 61 [and cases cited].)

### 7. *Challenges to California's Death Penalty Statute and Related Instructions*

Defendant raises various challenges to California's death penalty statute and the jury instructions thereunder. Our prior decisions have rejected them repeatedly, as follows.

The death penalty statute and instructions are not unconstitutional because they fail to assign a burden of proof for finding aggravating and mitigating circumstances, or because they do not require the state to prove beyond a reasonable doubt that an aggravating factor exists (except for other unadjudicated violent criminal activity), that aggravating factors outweigh the mitigating factors, or that death is the appropriate penalty. (*People v. Parson, supra,* 44 Cal.4th at p. 370 [and cases cited]; *People v. Whisenhunt, supra,* 44 Cal.4th at p. 227 [and cases cited].) Contrary to defendant's assertion, nothing in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] or *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] compels otherwise. (*People v. Parson, supra,* at p. 370 [and cases cited]; *People v. Whisenhunt, supra,* at p. 227 [and cases cited].)

The death penalty statute and instructions are not constitutionally flawed because they fail to require the state to bear the burden of persuasion regarding the penalty decision. (*People v. Parson, supra,* 44 Cal.4th at p. 371 [and cases cited]; *People v. Whisenhunt, supra,* 44 Cal.4th at p. 227 [and cases cited].) Nor are they unconstitutional for failing to require juror unanimity on the aggravating factors. (*People v. Whisenhunt, supra,* at pp. 227–228 [and cases cited]; *People v. Zamudio, supra,* 43 Cal.4th at p. 373.)

### 8. *Prosecutorial Misconduct*

During its penalty phase argument, the prosecution told the jury: "When they [defense counsel] stand here and ask for sympathy, compassion, mercy for this man, realize that he gave none, he deserves none." Although defendant made no objection or request for admonishment at trial, he now argues this was an improper appeal to the jury to consider vengeance as a reason for imposing the death penalty, thus constituting misconduct in violation of his state and federal constitutional rights to due process, a fair jury trial, and a reliable and individualized penalty determination.

Defendant's failure to object and request an admonishment forfeits review of this claim. (*People v. Benavides* (2005) 35 Cal.4th 69, 108 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) In any event, the claim fails on the merits.

After properly informing the jury that "the law recognizes that the defendant is entitled to sympathy, compassion, mercy," the prosecution argued, based on the facts, that this particular defendant did not deserve the jury's compassion, sympathy, or mercy. The prosecution is not guilty of misconduct when it attempts to persuade the jury that defendant has not presented a case deserving of sympathy or mercy. (*People v. Zambrano, supra*, 41 Cal.4th at p. 1176; *People v. Vieira* (2005) 35 Cal.4th 264, 296 [25 Cal.Rptr.3d 337, 106 P.3d 990].)

### 9. *Cumulative Error*

Defendant contends that cumulative error at both the guilt and penalty phases requires reversal. Apart from our finding that a modification of the judgment is warranted to correct the trial court's erroneous imposition of a death sentence on the second degree murder count (count two), we have rejected nearly all of defendant's other claims of error, and when we have found or assumed error, we have concluded defendant was not prejudiced. Whether we consider such claims individually or together, we find no prejudicial error at either phase of the proceedings.

### 10. *International Law*

Contrary to defendant's assertions, "[t]he California death penalty statute does not violate international law, specifically, the International Covenant on Civil and Political Rights, even assuming defendant has standing to invoke this covenant. [Citations.]" (*People v. Parson, supra*, 44 Cal.4th at p. 372.) Where, as here, a sentence of death complies with state and federal constitutional requirements, international law is not violated. (*People v. Cruz, supra*, 44 Cal.4th at p. 689.)

### III. Disposition

We affirm the judgment of death as modified to reflect that defendant's sentence on count two is imprisonment for 15 years to life.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 23, 2009. Werdegar, J., did not participate therein.