Filed 10/20/20  P. v. Thompson CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B298525 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA456264 |
| TIVEN KEITH THOMPSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge. Affirmed as modified in part, reversed in part, and remanded with directions.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Tiven Keith Thompson was convicted of trafficking three minors for commercial sex and raping one of them. He contends there is insufficient evidence to support two of the trafficking counts. We conclude that substantial evidence supports his conviction for trafficking Mykayla C. (count 6) but that there is insufficient evidence that he trafficked Angela Q. (count 5). Accordingly, we reverse count 5, modify the judgment to strike the sentence imposed for that count, and remand with directions.

## PROCEDURAL BACKGROUND

By amended information dated February 27, 2019, defendant was charged with three counts of human trafficking of a minor for a commercial sex act (Pen. Code,[1] § 236.1, subd. (c)(1); counts 5–7), one count of human trafficking of a minor for a commercial sex act by force or fear (§ 236.1, subd. (c)(2); count 8), and one count of forcible rape of a child over 14 (§ 261, subd. (a)(2); count 9).[2] The information also alleged that defendant personally used a firearm (§ 12022.5, subd. (a)) to commit count 8.

After a jury trial at which he did not testify, defendant was found guilty of counts 5, 6, 8, and 9. The jury was unable to reach a unanimous verdict on either count 7 or the firearm allegation associated with count 8; the court declared a mistrial for that count and allegation and later dismissed them.

---

[1] All undesignated statutory references are to the Penal Code.

[2] Two additional counts of rape (§ 261, subd. (a)(2); counts 10–11) were dismissed under section 995.

The court sentenced defendant to an aggregate determinate term of 16 years 4 months and a consecutive, indeterminate term of 15 years to life. For the determinate sentence, the court selected count 9 (§ 261, subd. (a)(2)) as the base count and imposed the upper term of 11 years. The court imposed consecutive terms of 2 years 8 months—one-third the midterm of 8 years—for counts 5 and 6 (§ 236.1, subd. (c)(1)). Finally, the court imposed a consecutive, indeterminate sentence of 15 years to life for count 8 (§ 236.1, subd. (c)(2)).

Defendant filed a timely notice of appeal.

## FACTUAL BACKGROUND

In the fall of 2016, Mykayla (age 15), T.C. (age 15, known as Ty), Angela (age 14 or 15, known as Angie), and Kayla H. (age 17) lived together in a group foster home in Simi Valley. As relevant here, the girls ran away from the group home twice— first, for three days in late September 2016, then, for two days in early October 2016. Mykayla and Ty testified at trial; Angie and Kayla did not.

### 1. The First AWOL—Day 1

On September 25, 2016, Ty, Mykayla, Kayla, and Angie were on a group-home outing to the El Capitan theater in Hollywood when they decided to leave without permission.[3] The girls took the subway to South Los Angeles, where they spent some time with Ty's boyfriend, Isaiah.

---

[3] Leaving the group home—or the supervision of group-home staff— without permission is known as going AWOL, which is short for "absent without leave."

On their way back to the train station, the girls met a man named Laffy, whom none of them knew. He appeared to be in his early 20s. Laffy was walking back to his car and started talking to Ty. He asked if the girls wanted to meet his brother; he may have also offered them marijuana. Ty and Kayla wanted to go with him, so all four girls got into the car.

Kayla asked Laffy to take her to the blade to make some money.[4] Eventually, he dropped her off on the Imperial blade at the corner of Crenshaw. Kayla asked Laffy to take care of the other girls while she worked and offered to pay him to do so.

Laffy took Ty, Mykayla, and Angie to a house just down the street on the Imperial blade and introduced them to a man named Blocka.[5] The group watched television and smoked some marijuana Blocka bought for them. Eventually, Laffy left; he acted like he was going to get Kayla, but neither he nor Kayla ever came back. Soon thereafter, a man later identified as defendant arrived. He introduced himself as "Profit the P"— vernacular for "Profit the Pimp."

Profit and Ty left to buy alcohol. When they returned, Ty drank a little bit; Angie drank enough to throw up; and Mykayla didn't drink at all. The three girls fell asleep in the living room.

At some point, Ty woke up, and Profit convinced her to work for him as a prostitute. He took Ty to a hotel room where

---

[4] *Make money* refers to working as a prostitute. *Blade* is a term used to describe a street or area where prostitutes go to make money.

[5] Although Mykayla later identified Blocka in a six-pack photo array, and he was ultimately arrested on an outstanding warrant, the record is silent as to Blocka's true name and whether he was charged with any crimes stemming from these events.

one of his other girls was working.[6] Her name was Wish, and she appeared to be in her 30s. Shortly thereafter, Profit, Ty, and Wish went to sleep.

## 2.    The First AWOL—Day 2

When Mykayla woke up at 7:00 or 8:00 the next morning, Angie and Blocka were still in the house, but Ty and Profit were gone.

Mykayla and Angie wanted to shower and change, but they didn't have any toiletries or clean clothes, so Blocka drove the girls to Fallas—a discount clothing store—and the 99¢ store. Angie and Mykayla didn't have any money, so while Blocka waited in the car, they stole some clothes from Fallas and stole some toiletries from the 99¢ store. Mykayla stole a tank top, sweatpants, underwear, and some chocolate. No one gave her advice about what kind of clothing to get.[7]

The girls returned to Blocka's car, and he brought them back to his house. When they arrived, Mykayla and Angie showered and changed. Then, Blocka told them that they needed to either make some money or leave. Mykayla understood *make money* to mean that Blocka wanted her to work as a prostitute.

Mykayla asked Blocka to drive them back to the Simi Valley group home, but he refused, so Mykayla called the group home using Angie's mobile phone. The staff member who answered told her to go to a police station, where someone would pick her up. Mykayla replied that she didn't know where the nearest station was or how to get there—but the staff member

---

[6] *Working* means working as a prostitute.

[7] The record does not reveal what Angie stole.

just told her to find one. Meanwhile, Angie didn't seem to want to leave Blocka's house, and Blocka said Ty would be returning later. Mykayla had no idea where she was; she had no phone or transportation; and she didn't want to leave by herself. She didn't know what else to do—so she agreed to work.

### 2.1. Mykayla and Angie Walk the Imperial Blade

That night, Blocka gave Mykayla and Angie some basic instructions and sent them out to work the Imperial blade. He gave each of them a handful of condoms and told them to come back if they ran out. He also told them to bring him any money they earned so they would not get robbed. The blade was right in front of Blocka's house, and he promised to come out if he saw anyone trying to grab them.

Mykayla and Angie walked the blade together for at least an hour, but neither of them caught any dates.[8] Men in cars propositioned both girls—but neither girl agreed to date them.

### 2.2. Ty Begins Working for Profit

While Mykayla and Angie were walking the Imperial blade for Blocka, Ty was working for Profit. Profit drove Wish and Ty to a hotel room for a date—a different room than the one in which they had spent the previous night. Profit let Wish and Ty out of the car, and they knocked on the hotel room door. They both had sex with the man inside, who gave them $200 each.

As they left the room, Wish grabbed Ty's $200 and called Profit to pick them up. Ty and Wish got into Profit's car, and Wish handed him the money they had earned.

---

[8] *Date* means have sex with someone for money.

### 2.3.    The Santa Ana Blade

Around 10:00 or 11:00 p.m., Profit drove Ty and Wish to the Imperial blade, where Ty saw Angie and Mykayla. The police arrived after about 10 minutes, however, so they all left for the Santa Ana blade in Orange County.

Ty and Wish rode in Profit's car. Mykayla and Angie rode in Blocka's car. Profit told Ty to give him any money she earned. Similarly, Blocka told Mykayla to call him if she caught any dates and to give him any money she earned.

When they arrived at the blade, Wish gave Angie, Mykayla, and Ty some instructions.[9] She told the girls that if other pimps pulled up and tried to get their attention, they should keep their heads down and avoid eye contact. They should always ask the tricks[10] if they are with law enforcement—and always approach cars from the driver's side, because police find that less suspicious than approaching from the passenger side. They should demand payment in advance and only let the tricks drive around the corner; they should not go anywhere else. Finally, Wish told Ty to give any money she made to Profit and told Mykayla and Angie to give their earnings to Blocka.

There were a lot of prostitutes—and a lot of tricks—on the blade that night. Initially, Ty, Mykayla, and Angie stood together on the same corner and walked together in the same places. But Mykayla and Angie didn't catch any dates. As on the Imperial blade, Mykayla was not actually trying to catch dates; she was just walking around so it looked like she was working. Any time a

---

[9] Kayla was not on the Santa Ana blade.

[10] A *trick* is a prostitute's customer.

car pulled up, Mykayla would talk briefly to the driver before walking off.

As such, Profit told Wish he was concerned that Angie and Mykayla were slowing Ty down. Wish, in turn, told Ty to walk on the other side of the street and not to hang around the other girls when she was working.

Ty ultimately caught a date. The date paid her more than $200. Ty had never handled that much money before, so she decided to keep it.

### 3. The First AWOL—Day 3

Sometime the next day, Angie and Mykayla took the bus to a police station. The police called the group home, who sent someone to pick them up. Meanwhile, Profit drove Ty to the train station; he gave her a mobile phone in which he stored his number under the name "Pimp." Ty then made her way back to the group home alone. Kayla found her way back later that night.

### 4. The Second AWOL—Day 1

Approximately a week later, through a series of phone calls with Blocka and Profit, the four girls arranged to leave the group home to meet them again. Each girl was motivated by different concerns. Mykayla wanted to retrieve her belongings from Blocka's house—namely, the clothes she had changed out of when she had showered there. Mykayla used Angie's phone to call Blocka, who said she could pick up her stuff, but she couldn't stay with him; she had to get her things and go. On the other hand, Kayla wanted to work for or with Profit. Ty testified that the second trip was Kayla's idea, and Ty went along only because Kayla had given Profit the group home's address. Ty also testified

that she returned because Profit had threatened to hurt her family, Mykayla, and Angie if she didn't come back.

The girls took the train to downtown Los Angeles, where Blocka and Profit picked them up in two cars. Kayla and Ty got into Profit's car. Mykayla and Angie got into Blocka's car.

The group convened at Blocka's house. Blocka took Mykayla, Angie, and Kayla to the Imperial blade; Wish joined them, along with a woman named Coco.

Ty stayed with Profit. Profit drove her to an apartment that belonged to his brother; there, he took her into the bathroom and raped her.

Meanwhile, Wish, concerned about the police presence on the Imperial blade, arranged for a Lyft to bring her, Kayla, Mykayla, and Coco—everyone except Angie—to the Western blade.[11] Coco tried to help Mykayla find dates and gave her pointers about prices and time limits. After about 30 minutes, Wish said there were too many police officers and not enough tricks; she arranged for another Lyft to take everyone to an apartment.

When they arrived, Ty, Profit, and Blocka were there. Blocka asked Mykayla if she had made any money; she told him she hadn't. Profit also asked Mykayla how much money she had made.

Mykayla, Kayla, and Ty all stayed at the apartment that night.

---

[11] Sometime after Blocka picked her up downtown but before Mykayla, Kayla, Wish, and Coco took the Lyft to the Western blade, Angie returned to the group home—but the record does not reveal when, how, or under what circumstances this occurred.

## 5.    The Second AWOL—Day 2

Mykayla woke up in the apartment around midday. She, Ty, and Kayla showered and dressed. Then, the three of them went back to Blocka's house.

Sometime after they arrived, Kayla left for work, and sometime after that, Mykayla and Ty left the house to look for her. As they searched, they saw Wish and Profit in a car following them.[12] Mykayla and Ty decided they would be safer in public and headed to McDonald's, where Ty would have access to wifi. Ty called the police to pick them up so they could go back to the group home. Meanwhile, Mykayla saw Blocka driving by and hid in a slide on the playground.

When Ty and Mykayla left McDonald's to continue their search, they saw Blocka in a car. He pulled up beside them and said, "Bitches, get in the car. What y'all doing?" Blocka told them they had left their belongings behind again. Mykayla was scared, so she and Ty got into the car and returned to Blocka's house.

Mykayla hurriedly collected her things. She told Ty to come with her—but Ty wouldn't leave Kayla. Ty called Kayla on the phone and Kayla told her, "You bitches need to choose up." Mykayla understood Kayla to mean that they should come work with her—and Kayla was working for Profit.

Mykayla decided to leave on her own. She made her way to a police station, and someone from the group home came to get her. Sometime later that day, Ty went to the Inglewood police

---

[12] Profit did not speak to them.

station and reported the rape. She underwent a sexual assault exam, then returned to the group home.[13]

## DISCUSSION

### 1. Sufficiency of the Evidence for Trafficking Mykayla (Count 6) and Angie (Count 5)

A criminal defendant may not be convicted of any crime or enhancement unless the prosecution proves every fact necessary for conviction beyond a reasonable doubt. (U.S. Const., 5th & 14th Amends.; see Cal. Const., art. I, §§ 7, 15; *In re Winship* (1970) 397 U.S. 358, 364; *People v. Tenner* (1993) 6 Cal.4th 559, 566.) "This cardinal principle of criminal jurisprudence" (*Tenner*, at p. 566) is so fundamental to the American system of justice that criminal defendants are always "afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." (*United States v. Powell* (1984) 469 U.S. 57, 67.)

Here, defendant contends there is insufficient evidence to support his convictions for trafficking Mykayla (count 6) and Angie (count 5). He argues that there is no evidence he "had, attempted to have, or intended to have, a pimp–prostitute relationship with either Angie or Mykayla … [n]or was there evidence that [defendant] ever personally persuaded either Angie or Mykayla to prostitute—Blocka was their pimp and persuader."

---

[13] Ty continued to run away from various group homes and shelters and to work for Blocka and Profit as a prostitute until January 2017. During that time, she was repeatedly beaten and raped. We do not discuss those later events, however, because they are not germane to the issue in this appeal: defendant's convictions for trafficking Mykayla and Angie.

The People respond that the "evidence established that [defendant] engaged in pandering, both directly and through the prostitute he used to train the girls. In addition, substantial evidence establishes that [defendant] and Blocka were literal partners in crime, with [defendant] being the senior partner."

### 1.1. Standard of Review

In assessing the sufficiency of the evidence to support a conviction, we review the entire record to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may not reweigh the evidence or resolve evidentiary conflicts. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The same standard applies where the conviction rests primarily on circumstantial evidence. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)

Deference is not abdication, however, and substantial evidence is not synonymous with *any* evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577.) " 'A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' [Citation.] Although substantial evidence may consist of inferences, those inferences must be products of logic and reason

12

and must be based on the evidence." (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) Accordingly, we "may not … ' "go beyond inference and into the realm of speculation in order to find support for a judgment." ' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 947; *People v. Waidla* (2000) 22 Cal.4th 690, 735 [speculation is not evidence and cannot support a conviction].) Evidence that merely raises a strong suspicion of guilt is insufficient to support a conviction. (*People v. Thompson* (1980) 27 Cal.3d 303, 324.)

### 1.2. Elements of Sex Trafficking

To convict defendant of sex trafficking in counts 5 and 6, the prosecution was required to prove:

- ◦ Defendant caused, induced, or persuaded Mykayla and Angie to engage in a commercial sex act—or intended to do so;

- ◦ When defendant acted, he intended to commit the crime of pandering (§ 266i); and

- ◦ When defendant did so, Mykayla and Angie were under 18 years of age.

(§ 236.1, subd. (c); CALCRIM No. 1244.)

To prove the second element—that defendant intended to commit pandering—the prosecution had to prove:

- ◦ Defendant intended to use promises, threats, violence, or any device or scheme to persuade Mykayla and Angie to become prostitutes, although he need not have been successful; **or**

- ◦ Defendant intended to arrange for Mykayla and Angie to be prostitutes in either a house of

13

> prostitution or any other place where prostitution is encouraged or allowed; **and**

- ◦ Defendant intended to influence Mykayla and Angie to be prostitutes.

(§ 266i; CALCRIM No. 1151.) "The language of the pandering statute describes current conduct on the part of the defendant: inducing and encouraging. That current conduct is aimed at producing subsequent conduct by the target: that the target thereafter engage in acts of prostitution following a defendant's inducement or encouragement." (*People v. Zambia* (2011) 51 Cal.4th 965, 975.)

### 1.3. Substantial evidence supports defendant's conviction for trafficking Mykayla (count 6).

Defendant contends there is no evidence that he "ever personally persuaded" Mykayla to work as a prostitute. We disagree.

First, defendant extolled the benefits of prostitution to Mykayla. He told her she would earn enough money to buy whatever she wanted—a car, shoes, clothes—and that she would meet famous rappers. The jury could reasonably infer that in doing so, defendant attempted to "cause[ ] or persuade" Mykayla to work as a prostitute. (§ 236.1, subd. (c).)

Defendant also instructed Mykayla about how to conduct herself as a prostitute: ask potential dates if they worked for law enforcement; keep her head down around other pimps; collect payment in advance. And, when Mykayla returned from working the Western blade, defendant asked her if she had earned any money. The jury could reasonably infer from this conduct that

defendant was attempting to "cause" Mykayla to engage in commercial sex. (§ 236.1, subd. (c).)

Finally, the jury could reasonably conclude that this evidence demonstrated defendant's intent to pander Mykayla—namely, that he used "promises" or "any device or scheme" to "persuade[ ] or encourage[ ]" her to become a prostitute, and that he intended to influence her to do so. (§ 266i, subd. (a)(2); CALCRIM No. 1151.)

Thus, taken together, the evidence is legally sufficient to support defendant's conviction for count 6.

### 1.4. There is no substantial evidence to support defendant's conviction for trafficking Angie (count 5).

Count 5, however, is a different story. Unlike Mykayla, Angie did not testify at trial. Nor did any law enforcement witnesses testify about what, if anything, Angie said to them. And, the evidence supporting defendant's conviction for trafficking Mykayla does not support his conviction for trafficking Angie because those events occurred either after Angie had left—as when defendant asked Mykayla if she had made any money on the Western blade—or when Angie's whereabouts are unknown—as when defendant told Mykayla that if she worked as a prostitute, she would meet famous rappers and earn enough money to have anything she wanted. Indeed, the People point to just a few snippets of testimony that even mention defendant and Angie in proximity to each other—and they are mistaken about what that testimony says.

First, the People argue that defendant gave "the girls" instructions about interacting with the police and other pimps. The People cite to the following exchange:

Q. And who gave you the instruction about find out
what the trick wants and provide the service that
the trick wants?

A. A lot of people: Blocka, Profit, Wish, and Coco, I
guess.

Q. When Profit was giving you the instructions,
what instructions do you recall Profit giving you?

A. Basically, the same, like about the police and to
keep your head down by other pimps.

Q. Did you receive any instructions about the types
of dates that you were supposed to service or not
service?

A. No.

Q. When Profit was giving you instructions about
working the blade, who else was present other
than yourself?

A. Angie and Ty, I think.

Contrary to the People's claim, Mykayla does not testify here that defendant "gave the girls" certain instructions. At most, Mykayla testified that Angie was present when defendant instructed *Mykayla* to keep her head down if other pimps approached her. Mykayla was not asked whether defendant's advice was also directed at Angie—and the People do not explain how Angie's mere presence in a room in which defendant gave instructions to a *different person* amounts to substantial evidence that he attempted to cause, induce, or persuade Angie to engage in a commercial sex act. (§ 236.1, subd. (c).)

Next, the People insist that defendant "told Mykayla, Angela, and [Ty] they were to collect the money before having

16

sex." Again, the People are mistaken. As with the earlier testimony, Mykayla said that defendant gave *her*—Mykayla—those directions. When asked who else was present, Mykayla replied, "Angie. Angie, I think, Angie and Ty. I can't really remember." And again, Mykayla did not testify that defendant directed those instructions to Angie as well.

Moreover, in each instance, Mykayla could not remember the circumstances under which the statement was made or when it was made—and to the extent Angie's mere presence is relevant, the timing here matters. Angie and Mykayla spent almost all of their time with Blocka. Mykayla testified, "I barely seen Profit." Indeed, there are only two clear occasions when Mykayla and Profit were even in the same room: the first night at Blocka's house, when Angie was drunk enough to throw up but Mykayla was sober, and in the apartment after Mykayla walked the Western blade, when Angie was gone. Defendant instructing Mykayla under these circumstances does not support an inference that defendant gave Angie instructions about sex work, much less constitute substantial evidence that defendant trafficked her.

The People are also mistaken that Wish gave instructions to Mykayla and Angie at Blocka's house in defendant's presence. Mykayla testified that Wish was one of the people who instructed her about sex work. The prosecutor then asked where Mykayla saw Wish. Mykayla replied that she saw Wish at Blocka's house with Profit. The prosecutor asked about the nature of the instructions, then asked, "Where were you, Angie, and Ty when you were receiving these instructions from Wish?" Mykayla answered that she was on the blade. Thus, this testimony may support an inference that defendant was present when Mykayla

17

*met* Wish. And, it establishes that Wish gave instructions to Mykayla and Angie on the blade. But it does *not* establish that defendant was present when she did so. Nor, given the non-linear nature of the prosecutor's questioning style, is it susceptible to such an inference. To the contrary, Mykayla testified that she never saw Profit on the Santa Ana blade—or any other blade.

Next, the People assert Ty testified "that after she was raped, [she] saw Mykayla, Angela, and Kayla return to the house and give both [defendant] and Blocka money."[14] The People are referring to the following exchange:

Q. After the rape by Profit, did you ever see the other three girls: Angela, Mykayla, and Kayla?

A. Yes.

Q. What did you see them do when they returned?

A. They gave Profit and Blocka money.

This testimony does not support an inference that Angie gave money to defendant, however. First, the exchange is, at best, ambiguous about who gave what to whom: The question and answer are consistent with any subset of the three girls giving money to either or both of the two men. Second, there is no evidence anywhere in the record that Angie or Mykayla ever *made* any money; to the contrary, Mykayla testified that neither of them caught any dates and that they were otherwise penniless. Kayla, however, did make money—and Kayla turning over her

---

[14] The People posit that this is evidence that Blocka and defendant were part of a " 'pimping organization' " in which Blocka was the junior partner. As discussed *post*, however, the jury was not instructed on that theory, and we decline to consider it.

earnings to Blocka and/or Profit is consistent with both the question and the answer. Third, Ty was raped in the apartment Mykayla went to after working the Western blade. Mykayla testified that Angie had gone back to the group home by this point, which is consistent with Ty's later testimony in which she is adamant that Angie was *not* in the apartment with Mykayla and Kayla. Given the ambiguity of the initial statement, the context surrounding it, and Ty's later testimony to the contrary, the statement is not evidence that Angie gave money to defendant.

Finally, unable to point to any clear evidence of defendant's interactions with Angie, the People's main contention is that *Blocka's* and *Wish's* actions constitute substantial evidence that defendant is guilty of trafficking Angie. We disagree.

Although the prosecutor occasionally suggested below that the jury could attribute Blocka's and Wish's actions to defendant, the jury was not instructed on that topic. Specifically, neither party asked the trial court to instruct the jury with CALCRIM Nos. 400 and 401 on aiding and abetting, and the court did not give those instructions sua sponte.[15] (See *People v. Leonard* (2014) 228 Cal.App.4th 465, 489–490 [defendant guilty of pandering on an aiding and abetting theory].) Likewise, neither party requested, and the court did not give, CALCRIM Nos. 416 and 417, concerning evidence of an uncharged conspiracy and liability for coconspirators' acts. Indeed, the prosecutor's main

---

[15] Although the court has a sua sponte duty to instruct on aiding and abetting when the prosecution relies on it as a theory of culpability, neither party argues on appeal that the court erred by failing to give an aiding and abetting instruction here. (See *People v. Beeman* (1984) 35 Cal.3d 547, 560–561.)

theory of the case—and the *only* theory on which the jury was instructed—was that defendant was the direct perpetrator.

Furthermore, while the People contend that Blocka's and Wish's behavior amounts to substantial evidence of defendant's guilt, they offer us no authority suggesting that we may find substantial evidence here using a legal theory the jury was not provided, based on evidence the jury was not told how to evaluate. As such, we do not address whether the evidence would have been sufficient to support defendant's conviction under an aiding and abetting or co-conspirator theory.[16]

Having reviewed the entire record, we conclude there is no substantial evidence to support defendant's conviction for count 5.

### 1.5. The judgment is modified to strike the sentence for count 5.

When a conviction is reversed on appeal for lack of substantial evidence, the typical remedy is to remand for resentencing so that the trial court may restructure its sentencing choices to compensate for the lost count. (See *People v. Navarro* (2007) 40 Cal.4th 668, 681, quoting *People v. Burbine*

---

[16] We are aware that under section 236.1, subdivision (d), "'[i]n determining whether a minor was caused, induced, or persuaded to engage in a commercial sex act, the totality of the circumstances, including the age of the victim, his or her *relationship to* the trafficker or *agents of the trafficker*, and any handicap or disability of the victim, shall be considered." (Italics added.) CALCRIM No. 1244 contains language tracking this provision; here, however, the court omitted the phrase "agents of the trafficker" from the instruction. And, in any event, the People's argument here involves evidence of Blocka's and Wish's *actions*; the People do not point to any evidence concerning Mykayla's or Angie's "relationship to" Blocka or Wish.

(2003) 106 Cal.App.4th 1250, 1259 [" 'upon remand for resentencing after the reversal of one or more subordinate counts of a felony conviction, the trial court has jurisdiction to modify every aspect of the defendant's sentence on the counts that were affirmed, including the term imposed as the principal term' "].) Here, however, "the trial court imposed the maximum possible sentence. As there are no sentencing choices to restructure, it is appropriate for us to modify the sentence on appeal. (§ 1260 [appellate court's power to modify judgments]; *People v. Rogers* (2009) 46 Cal.4th 1136.)" (*People v. Francis* (2017) 16 Cal.App.5th 876, 887.)

Accordingly, in the interest of judicial economy, we modify the judgment as follows: The subordinate term imposed for count 5 is stricken, reducing the aggregate determinate sentence to 13 years 8 months. There is no change to the indeterminate sentence. The total court security fees (§ 1465.8) are reduced from $160 to $120. The total criminal conviction assessments (Gov. Code, § 70373) are reduced from $120 to $90.

## 2. The abstract of judgment is inaccurate and must be corrected.

In a criminal case, the oral pronouncement of a sentence constitutes the judgment. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.) "An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *Mesa*, at p. 471 [to the extent a minute order diverges from the sentencing proceedings it purports to memorialize, it is presumed to be the product of clerical error].) Accordingly, courts may correct clerical errors at any time, and appellate courts may order

21

correction of an abstract of judgment that does not accurately reflect the oral pronouncement of sentence. (*Mitchell*, at pp. 185–188.)

Here, the court properly imposed one $40 court security fee (§ 1465.8) and one $30 criminal conviction assessment (Gov. Code, § 70373) for each of the four counts of conviction, for a total of $160 in court security fees and $120 in criminal conviction assessments. All of those fees are reflected on the abstract of judgment for the indeterminate sentence—along with the restitution fine and defendant's pretrial custody credit. However, fees for two of the determinate counts are also listed a *second time* on the determinate abstract of judgment. When the two abstracts are combined, therefore, the fees are too high.

Because the abstract of judgment for the determinate sentence contains duplicative fees, it must be corrected to remove them. (See *People v. Mitchell, supra,* 26 Cal.4th at pp. 185–188 [discussing the importance of correcting inaccurate abstracts of judgment on appeal].) Because we have modified the judgment to strike defendant's sentence for count 5, the court must also reduce the fees on the indeterminate abstract of judgment as outlined in section 1.5, *ante.*

**DISPOSITION**

Count 5 is reversed for insufficient evidence and the judgment is modified to strike the sentence for count 5, as discussed in section 1.5 of the discussion. In all other respects, we affirm as modified. Upon remand, the court is instructed to: (1) enter a judgment of acquittal on count 5; (2) amend the minute order of May 21, 2019, to reflect the judgment as modified; (3) amend the abstract of judgment for the *determinate* sentence to reflect the judgment as modified and delete the court fees; (4) amend the abstract of judgment for the *indeterminate* sentence to reduce the court security fees (§ 1465.8) to $120 and to reduce the conviction assessments (Gov. Code, § 70373) to $90; and (5) forward certified copies of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

The clerk of this court is directed to send a certified copy of this opinion and the remittitur to the Department of Corrections and Rehabilitation. (Cal. Rules of Court, rule 8.272(d)(2).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


EGERTON, J.

23